OPINION OF THE COURT
Leslie Crocker Snyder, J.
The Grand Jury of the County of New York has returned an *14 indictment charging the defendant with the crime of enterprise corruption in violation of Penal Law § 460.20 (1) (a) and other related offenses. Defense counsel has moved to dismiss the enterprise corruption count under CPL 210.20 (1) (b) on the grounds that the evidence presented to the Grand Jury was not legally sufficient to establish the offense charged.[1]
EVIDENCE ADDUCED BEFORE THE GRAND JURY
The defendant was the president of Yarmy Sporting Company, a wholesale/retail firearms supply business, which operated from the defendant’s home, located at 9 Runyon Place in Scarsdale, New York. As a licensed dealer of firearms, Richard Yarmy holds a Federal firearms license (FFL) in the State of New York and has sold guns at shows in New York, Massachusetts, Virginia and Pennsylvania.
The evidence established that towards the end of 1991, Richard Yarmy met Hubert Lugo, a resident of New York County, at a New York gun show. From his service in the Armed Forces, Lugo was experienced in the operation and repair of firearms. Utilizing his training, he repaired guns and supplied ammunition to residents of his neighborhood, many of whom were street-level crack dealers or members of various drug gangs. Lugo attended gun shows and purchased large amounts of ammunition from Yarmy, becoming a regular customer.
In February of 1992, Lugo requested more ammunition than Yarmy had available at a gun show and Lugo went to Yarmy’s house to pick up his supply. At that time, Yarmy informed Lugo that he had a .38 caliber handgun he wanted Lugo to "get rid of” for him. Lugo sold the revolver to one of his neighborhood customers for $350, giving the defendant $300.
Yarmy asked Lugo if he would be willing to engage in similar sales for him in the future despite the fact that he knew that Lugo was not licensed to purchase, sell or carry a firearm. Lugo, realizing the potential profits to be made from selling guns to the many drug dealers in his neighborhood, agreed to Yarmy’s proposal.
The People’s evidence showed that Lugo made a series of illegal weapon sales to two different undercover officers. To one *15 undercover officer, he made three separate sales, displaying an assortment of available weapons and ammunition to the officer. Another undercover officer purchased guns from Lugo on four occasions and "in an emergency situation to take care of some dealers”, from Lugo’s wife.
In addition, a separate sale to one of the undercover officers was scheduled to take place at Yarmy’s house. However, Yarmy apparently became suspicious and aborted this sale, threatening Lugo with a gun and ordering him to cease negotiations.
Lugo included a full supply of ammunition with each weapon he sold. A search of Lugo’s apartment at the time of his arrest yielded 16 guns and a quantity of ammunition. At no point did Lugo obtain a license to possess or to sell firearms.
After completing the sales, Lugo would return to Yarmy’s residence in Westchester County to give the defendant his share of the proceeds. To determine his selling price for the weapons, Lugo would simply add his "commission” to the amount that Yarmy wanted for each gun.
On some occasions, Lugo was assisted by family members in making the sales. Lugo’s wife, Myrna, sold a Sten machine gun with Black Talon bullets to the undercover in Lugo’s absence and his brother, Jaime, was present for some of the sales and on one occasion acted as a lookout.
CONCLUSIONS OF LAW
The evidence presented to the Grand Jury clearly established that Yarmy and Lugo conspired to sell firearms illegally. The issue presented to this court is whether this systematic course of conduct also meets the criteria constituting the crime of enterprise corruption and satisfies every element of that statute.
The standard for a trial court to apply in evaluating the sufficiency of Grand Jury minutes is whether the evidence, if unexplained and uncontradicted, would warrant a conviction by a petit jury. (People v Jennings, 69 NY2d 103; People v Cooks, 230 AD2d 683.)
Section 460.20 (1) of the Penal Law defines the three ways in which the crime of enterprise corruption may be committed:
"[a] person is guilty of enterprise corruption when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he:
*16 "(a) intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity; or
"(b) intentionally acquires or maintains any interest in or control of an enterprise by participating in a pattern of criminal activity; or
"(c) participates in a pattern of criminal activity and knowingly invests any proceeds derived from that conduct, or any proceeds derived from the investment or use of those proceeds, in an enterprise.”
As pointed out in the Practice Commentaries, the purpose of Penal Law article 460 is to arm State prosecutors with the ability to prosecute organized crime activities on a similar— but more limited — basis than the Federal Racketeer Influenced and Corrupt Organizations Law (RICO). (Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law art 460, at 552-559.) The intent of the Legislature was to define the scope of the enterprise corruption statute more rigorously than comparable Federal statutes. (Penal Law § 460.00; People v Cantarella, 160 Misc 2d 8 [1993]; People v Capaldo, 151 Misc 2d 114 [1991]; People v Moscatiello, 149 Misc 2d 752, 754-755 [1990].)
The target group envisioned by the Legislature in enacting the Organized Crime Control Act (OCCA) was discussed by one of the statute’s authors, Assembly Member Melvin H. Miller, then Chair of the Committee on Codes. In a letter to Evan A. Davis, counsel to the Governor, Mr. Miller wrote: "[t]he members of the Codes Committee felt that the extraordinary sanctions allowed under the Act should be reserved for those who not only commit crimes but do so as part of an organized criminal enterprise * * * For that reason, it was not the sponsors’ intent to redefine or sanction anew conduct already punishable under current law * * * Rather, the bill now requires association with an ascertainably distinct criminal enterprise in addition to corruption of a legitimate enterprise by criminal activity.” (July 16, 1986 letter from Melvin H. Miller, Chair, Bill Jacket, L 1986, ch 516.)
To prove a prima facie case of enterprise corruption, the People must first establish the existence of a criminal enterprise. (People v Cantarella, 160 Misc 2d 8, 13, supra.) Penal Law § 460.10 (3) defines "criminal enterprise” as follows: "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the *17 scope of individual criminal incidents.” This statutory definition requires the People to show: (1) a common purpose, (2) a distinct ascertainable structure and (3) a continuity of existence.
The court has reviewed the Grand Jury minutes in this case and finds that although the evidence showed that the defendant and Lugo shared a common purpose, the People failed to establish the presence of a distinct ascertainable structure with a continuity of existence.
A. Common Purpose
The first element that the People must prove is that the members of the enterprise shared , a common purpose. The evidence established that the defendant and Lugo engaged in a conspiracy to sell firearms illegally as part of a scheme which allowed each person to profit from the sales. The court finds that this conspiracy satisfies the common purpose requirement of the OCCA statute.
B. The Distinct Ascertainable Structure
The second element which the People must prove is the existence of an ascertainable structure distinct from the pattern of criminal activity. The statute requires a showing of association with a criminal enterprise which has a scope and purpose beyond the particular conspiracy or corrupt acts involved. (Letter from Melvin H. Miller, Chair, op. cit., Bill Jacket, L 1986, ch 516.) The evidence must show "a system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses * * * [or] more than a mere ad hoc association.” (People v Wakefield Fin. Corp., 155 Misc 2d 775, 785 [1992]; see also, People v Forson, NYLJ, May 12, 1994, at 29, col 3.)
To support their theory that the defendant headed an enterprise, the People argue that Yarmy directed the sales of firearms by Lugo, that Lugo was assisted by Myrna and Jaime and that the customers were part of the enterprise because they continuously demanded to purchase weapons and recruited other customers.
However, after careful review of the Grand Jury minutes, this court finds that the prosecution failed to show an ascertainable structure distinct from the pattern of criminal activity. One element that is clearly lacking in the instant case is any semblance of a hierarchical organization beyond what is minimally necessary to effectuate the individual sales. As the *18 courts found in Cantarella (supra) and Riccobene; this organizational structure is critical to establishing an enterprise. (People v Cantarella, 160 Misc 2d 8, supra; United States v Riccobene, 709 F2d 214 [3d Cir], cert denied sub nom. Ciangalini v United States, 464 US 849 [1983].)
In Cantarella (supra), eight defendants were prosecuted for enterprise corruption and related crimes performed in order to enhance the circulation numbers of the New York Post. This enterprise had an organized structure with the head of the crime family instructing the superintendent of delivery, who used his position of authority to further the criminal schemes. Some of the employees working under the superintendent were also involved in the criminal activity, forming a clear organizational structure.[2]
Federal courts also focus on the importance of showing a hierarchy in RICO prosecutions. For example, in United States v Riccobene (supra), six defendants were prosecuted for enterprise corruption and related crimes. The defendants were allegedly members of a "crime family” in Philadelphia. In that case, the Government showed that the "family” structure consisted of individual operators who reported to supervisors who were responsible to an "underboss”, who was directed by the head of the enterprise.
The organizations established by the evidence in both Cantarella (supra) and Riccobene (supra) utilized a greater number of members, with more formalized, defined and specialized roles than the association between Yarmy, Lugo and Lugo’s family in the instant case.
In order for the defendant Richard Yarmy to have been the "boss”, he would have had to supervise individuals with clearly defined roles. However, Myrna sold only one weapon on an "emergency” basis when Lugo was unavailable and Jaime was present and acted as a lookout at one sale. Consequently, rather than directing a structured organization, the defendant was simply conspiring and acting in concert with Lugo to sell firearms and Lugo’s family was assisting him on occasion. Therefore, there were only two roles in this alleged enterprise: Yarmy was the supplier and Lugo was the distributor. Myrna was a fill-in and conducted one sale and Jaime warned Lugo on one occasion that the police were nearby.
*19 Finally, the court rejects the People’s attempt to stretch the parameters of this association by including the customers as members of the organization. The customers in this case were not "employed by or associated with” Yarmy Sporting Company as required by Penal Law § 460.20 (1). Their only concern was to obtain firearms illegally, with no intent to further the enterprise. Such a position, if accepted by the court, would be the equivalent of an addict on a street corner who purchased a vial of crack being held accountable for a criminal enterprise that reached to the highest echelon of the Colombian cartels. This clearly was not the intent of the OCCA statute.
The facts of this case are similar to those presented in People v Moscatiello (149 Misc 2d 752, supra). In Moscatiello, the People alleged that the defendant Moscatiello would arrange or transmit bribes from contractors to an informant to influence the informant in his capacity as a union official. The codefendant Schepis allegedly assisted Moscatiello with the bribes. The charge of enterprise corruption was based upon the roles played by each member of the alleged enterprise.
In dismissing the enterprise corruption count, the court noted that the People showed that the defendant was a "director” of the "enterprise”, with codefendant Schepis his "assistant” and Eckhaus the "instrument” of the criminal activity. However, the court found that the People failed to establish that these individuals were " 'associated in an ascertainable structure distinct from a pattern of criminal activity, and with a [scope] of existence, structure and criminal purpose beyond the scope of individual criminal incidents’ ”. (People v Moscatiello, supra, at 754.) The Moscatiello court held: "[t]hat three people who commit crimes together assign themselves separate roles does not result in a structure 'distinct from [their] pattern of criminal activity’ ”. (Supra, at 756.)
In this case, other than Yarmy requesting that Lugo compensate him for the weapons upon receipt and his order to halt one of the sales, there is no evidence that Yarmy was the kingpin of a criminal enterprise. The relationship between Yarmy and Lugo was based upon their business alliance and was symbiotic, with each person realizing that he could benefit financially from the conspiracy to sell firearms.
Finally, the evidence shows that the ability of the "enterprise” — Yarmy Sporting Company — to purchase firearms for resale depended entirely upon the defendant’s Federal firearms license. This license did not give Yarmy Sporting Company, or its representatives, the ability to purchase guns *20 from, the manufacturer but was issued personally to the defendant. Consequently, the scheme to buy and resell guns was completely dependent on the defendant’s personal license, providing further evidence that there was no separate enterprise.
C. Continuity of Existence
The third and final element necessary to establish the existence of a criminal enterprise is continuity of existence. A criminal enterprise exists when its purpose is larger in scope than any one of the particular criminal transactions, and the continuation of the criminal enterprise does not depend for its existence upon the continuation of any particular criminal transaction. (Penal Law § 460.10 [3]; People v Cantarella, 160 Misc 2d 8, supra.) Furthermore, the enterprise must continue in existence beyond the time required to commit any individual criminal incident, and must be distinct from any ad hoc association entered into for the purpose of carrying out one or more of the criminal incidents. (People v Wakefield Fin. Corp., 155 Misc 2d 775, supra.)
When discussing this element, both Federal and New York State courts have held that the management structure of an enterprise need not be so rigid as to resemble a corporate flow chart, so long as the enterprise continues with the same purpose and any new members joining the enterprise fill roles previously performed by former members. (See generally, United States v Lemm, 680 F2d 1193 [8th Cir 1982], cert denied 459 US 1110 [1983]; Delta Truck & Tractor v Case Co., 855 F2d 241 [5th Cir 1988], cert denied 489 US 1079; United States v Kragness, 830 F2d 842 [8th Cir 1987]; United States v Riccobene, 709 F2d 214, supra; People v Wakefield Fin. Corp., 155 Misc 2d 775, supra.)
Logically, one important factor in determining continuity is whether the organization could exist after the removal — by arrest or otherwise — of any of the participating member(s). In this case, it is unlikely that Lugo or anyone else, without Richard Yarmy or his FFL, could maintain the existence of Yarmy Sporting Company. To put it succinctly, without Richard Yarmy and his personal FFL, there is no Yarmy Sporting Company. Therefore, the organization could not continue *21 to exist as a criminal enterprise independently of the defendant.[3]
The evidence adduced before the Grand Jury establishes a conspiracy between Yarmy and Lugo to sell firearms along with a series of illegal gun sales. It does not establish the existence of a separate criminal enterprise with a distinct ascertainable structure and continuity of existence.[4]
This court concurs with the People’s contention that the statutes proscribing the illegal sale of firearms are grossly inadequate in view of the devastation that guns have brought to this city, especially when they are used by drug gangs to stake out their territory and to further their illicit business. However, this legislative inadequacy cannot be remedied by permitting the prosecution to use penal sanctions which were not drafted to encompass the defendant’s behavior.
The court has reviewed carefully the facts of this case and finds that the People have not adduced legally sufficient evidence to support the charge of enterprise corruption. For the reasons set forth above, the defendant’s motion to dismiss that count under CPL 210.20 (1) (b) is granted.
By separate decision, the defendant’s motion to dismiss the charge of conspiracy and the remaining 23 other firearms-related counts is denied.

. In view of the court’s decision, this opinion does not address defense counsel’s motion to dismiss in the "interest of justice” under CPL 210.40 (2) on the grounds that prosecution of the enterprise corruption count is inconsistent with the stated legislative findings.

. The court found that the Grand Jury minutes established the defendant Cantarella’s commission of only two pattern acts, thereby requiring dismissal of the enterprise corruption count.

. The dependence of the enterprise on the continued participation of one or more of its key members does not end the inquiry into continuity of existence. For example, had Yarmy Sporting Company been in existence for 10 years, with Lugo and a number of others on his level selling firearms for Yarmy as part of a broader structure, this court could envision the People’s proof satisfying the continuity of existence requirement, even though the enterprise would cease to operate with Yarmy’s arrest. However, in this case, with only two active members in the "organization” and with Yarmy being the personal licensee, the enterprise lacks structure and continuity.
The failure of the legislative drafters to define adequately the term "enterprise” due to the "fluid nature of criminal associations” (United States v Swiderski, 593 F2d 1246, 1249 [DC 1978], cert denied 441 US 933 [1979]) and "because of its highly diverse nature” (Penal Law § 460.00), calls to mind Justice Stewart’s apt statement in Jacobellis v Ohio (378 US 184, 197 [1964] [concurring opn]) referring to obscenity, "I know it when I see it, and * * * [this] is not [it].”

. In view of the court’s decision, the court does not address the statutory requirement of showing a "pattern of criminal activity”, defined in Penal Law § 460.10 (4).