[923 NYS2d 34]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v WESTERN EXPRESS INTERNATIONAL, INC., JOHN WASHINGTON, VADIM VASSILENKO, DOUGLAS LATTA, LYNDON ROACH and ANGELA PEREZ, Also Known as ANGELA CIANNO, Respondents.

First Department, April 19, 2011

## APPEARANCES OF COUNSEL

*Cyrus R. Vance, Jr., District Attorney*, New York City (*David M. Cohn* and *Mark Dwyer* of counsel), for appellant.

*Michele Hauser*, New York City, for John Washington, respondent.

*Marianne Karas*, Armonk, for Vadim Vassilenko, respondent.

*Theodore M. Herlich*, New York City, for Douglas Latta, respondent.

*Steven Banks, The Legal Aid Society*, New York City (*Allen Fallek* of counsel), for Lyndon Roach, respondent.

*Galluzzo & Johnson LLP*, New York City (*Matthew J. Galluzzo* of counsel), for Angela Perez, respondent.

## OPINION OF THE COURT

SAXE, J.

These appeals concern the intended scope of the enterprise corruption provision (Penal Law § 460.20) of New York's Organized Crime Control Act (OCCA) (Penal Law tit X). The question presented for our consideration is whether the proof presented to the grand jury sufficed to show that defendants' combined activities constituted the type of "ascertainable structure" needed to satisfy the definition of criminal enterprise under Penal Law § 460.10 (3). We conclude that the evidence is sufficient to establish the type of criminal enterprise covered by the statute, and, accordingly, we reverse and reinstate those counts of the indictment.

Before the advent of widespread use of the Internet, organized criminal organizations were always tangible entities whose location could be pinpointed and whose members could generally be found in relatively close proximity to each other and their victims. The Internet has provided an extraordinarily useful new tool for criminals to perpetrate crimes in entirely new ways. Not only does the Internet permit individuals to commit traditional criminal offenses in cyberspace through the use of computers (*see* Goodman and Brenner, *The Emerging Consensus on Criminal Conduct in Cyberspace*, 2002 UCLA J L & Tech 3 [2002]; Katyal, *Criminal Law in Cyberspace*, 149 U Pa L Rev

1003 [2001]), but it created the opportunity for loosely organized networks to coordinate large-scale criminal operations such as thefts of millions of dollars in funds from banks worldwide, or the penetration of telephone network computer systems and theft of phone card information (*see* Rustad, *Private Enforcement of Cybercrime on the Electronic Frontier*, 11 S Cal Interdisc LJ 63 [2001]).

The groups, or networks, that commit such large-scale criminal operations do not resemble traditional organized crime models. As one commentator has remarked, the Internet allows criminals to commit crimes "without formal organization" since there is no need for physical contact or geographical control; contacts and coconspirators can remain faceless, and participation in a scheme need not involve the giving and following of orders, but may be carried out after general discussion in a virtual chat room (*see* Lauren L. Sullins, Comment, *"Phishing" for a Solution: Domestic and International Approaches to Decreasing Online Identity Theft*, 20 Emory Int'l L Rev 397, 418 [Spring 2006]). It has been observed that the structure of these criminal enterprises using the Internet may be fundamentally different than the hierarchical model typical of traditional organized crime; in the context of the Internet, traditional hierarchies are replaced by networks, and a hallmark of the network-style structure is decentralized power and authority (*see* Brenner, *Toward a Criminal Law for Cyberspace: Distributed Security*, 10 BU J Sci & Tech L 1 [2004]).

One new form of crime made possible by the Internet involves the theft and resale of computerized information, such as credit card data, for subsequent fraudulent use by others (*see* Peretti, *Data Breaches: What the Underground World of "Carding" Reveals*, 25 Santa Clara Computer & High Tech LJ 375 [2009]). A particular type of criminal enterprise has emerged from this new form of crime: "websites known as 'carding forums' that facilitate the sale of, among other contraband, stolen credit and debit card numbers," which offer participants a variety of forms of assistance in perpetrating their crimes (*id.* at 381).

Since the time that cybercrime first emerged, prosecution of its various forms has involved the use of both long-established criminal statutes and new legislation. That is, some long-standing criminal prohibitions have been found to cover crimes committed with the use of computers, including the various criminal acts falling within the category of "carding." Federal law enforcement has targeted and prosecuted some of these acts

by charging a number of individuals with such crimes as conspiracy, identity theft, trafficking in illegal information, credit card fraud, and money laundering (*see* Peretti, at 395-403; Hsu, *French arrest cyber-crime suspect for U.S.*, Washington Post, Aug. 12, 2010, at B04). However, in some respects, new criminal legislation such as the federal Computer Fraud and Abuse Act (18 USC § 1030) has been determined to be necessary to effectively combat such crime (*see* Sinrod and Reilly, *Cyber-Crimes: A Practical Approach to the Application of Federal Computer Crime Laws*, 16 Santa Clara Computer & High Tech LJ 177, 179, 180-181 [2000]; Heymann, *Legislating Computer Crime*, 34 Harv J on Legis 373 [1997]). Beginning in the 1980s, a wave of computer-crime-related criminal laws began to be enacted worldwide,

> "precipitated by the inadequacy of the existing traditional criminal provisions, which protect exclusively physical, tangible and visible objects against traditional crimes, in the advent of cybercrime. The new laws addressed the new capabilities of computer related crimes to violate traditional objects through new media (such as stealing money by manipulating bank accounts), to involve intangible objects (such as computer programs), and to employ new methods of committing crimes made possible by increasing use and reliance on computer systems and networks." (Goodman and Brenner, *The Emerging Consensus on Criminal Conduct in Cyberspace*, 2002 UCLA J L & Tech 3 [2002].)

During this same period, specifically in 1986, New York enacted the OCCA (Penal Law tit X, art 460, § 460.00 *et seq.*), having concluded that "new penal prohibitions and enhanced sanctions, and new civil and criminal remedies are necessary to deal with the unlawful activities of persons and enterprises engaged in organized crime" (§ 460.00). Since the intended scope of the OCCA is central to this appeal, it is fortunate that that scope may be discerned primarily from the legislative findings that introduce the Act, making it unnecessary to rely on the remarks of members of the Legislature found in the statute's bill jacket. These statutory legislative findings explain how organized crime now involves "highly sophisticated, complex" criminal activity, and describe how "legitimate enterprises [are] being employed as instrumentalities, injured as victims, or taken as prizes" (*id.*). The findings relate that the

Act was considered necessary because "[e]xisting penal law provisions are primarily concerned with the commission of specific and limited criminal acts without regard to the relationships of particular criminal acts or the illegal profits derived therefrom, to legitimate or illicit enterprises operated or controlled by organized crime" (*id.*). These findings also recognize that sometimes a series of criminal acts, even if they arguably form a pattern, may be fully and properly prosecuted under existing criminal laws. The Act attempts to carefully define the terms "pattern of criminal activity" and "criminal enterprise" so as to give the prosecutor, the grand jury, and the Judiciary the means by which to determine when a group's pattern of criminal acts may fairly be said to constitute part of a larger "criminal enterprise," while allowing for their exercise of discretion (*id.*).

Therefore, when a business enterprise takes what would otherwise be a series of individual criminal acts by various participants, and attempts to incorporate those participants, and their criminal transactions, into a larger, ongoing criminal enterprise, the OCCA prompts us to look for a broader structure beyond the individual crimes perpetrated, and authorizes the prosecution of the larger organization as a whole, "because their sophistication and organization make them more effective at their criminal purposes and because their structure and insulation protect their leadership from detection and prosecution" (*id.*).

Although the forms of Internet crime have been evolving and becoming far more sophisticated over the decades since the OCCA was first enacted, the question is not whether the Legislature had this particular type of criminal enterprise in mind when it formulated the language of the statute. Rather, we need only decide whether the structure of the enterprise at issue falls within its definition of enterprise corruption.

The type of enterprise corruption charged here, under Penal Law § 460.20 (1), occurs when a defendant,

> "having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, . . .

> "(a) intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity."

The "criminal enterprise" with which the defendant must be

associated is defined in Penal Law § 460.10 (3) as "a group of persons sharing a common purpose of engaging in criminal conduct, associated in *an ascertainable structure distinct from a pattern of criminal activity*, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (emphasis added). Therefore, while a charge of enterprise corruption under section 460.20 requires that the defendants participated in a "pattern of criminal activity," that is not sufficient; the element most critical here is the requirement that the criminal enterprise must have "an ascertainable structure *distinct from* [that] pattern of criminal activity" (Penal Law § 460.10 [3] [emphasis added]).

 The motion court concluded that the evidence failed to show the requisite "structure" of the charged enterprise, observing that "courts have consistently required some evidence of a system of authority or hierarchy binding the defendants together." (*People v Latta*, NYLJ, Aug. 1, 2008, at 26, col 1, 2008 NY Misc LEXIS 4967, *3-4 [Sup Ct, NY County 2008].) In our view, however, the criminal operation created by Western Express, in which the individual defendants participated, had the requisite "ascertainable structure distinct from [its] pattern of criminal activity" so as to qualify as a "criminal enterprise" as defined by the statute. The statute does not require any particular structure for the enterprise, and nowhere does it indicate that it contemplates a traditional hierarchical organized crime model; I see no reason to preclude its application to a non-traditionally-arranged, non-hierarchically-structured criminal enterprise.

The indictment here charges that Western Express International, its president, Vadim Vassilenko, and the four other individual defendants appealing here, as well as various other individuals not parties to this appeal, formed and participated in an operation of this type. Defendants are charged with a wide variety of crimes, including scheme to defraud (Penal Law § 190.65), money laundering (Penal Law §§ 470.15, 470.20), and grand larceny (Penal Law § 155.40), as well as enterprise corruption. However, the only counts at issue on appeal are those charging each of the defendants with enterprise corruption under the OCCA (Penal Law § 460.20).

The indictment alleges that defendants comprised a "cyber-crime" enterprise that used the structure and facilities of Western Express to systematically traffic in stolen credit card data, using money-laundering processes made possible by

Western Express in order to avoid detection. The evidence presented to the grand jury, including information retrieved from computers seized at Western Express's headquarters and Vassilenko's residences, as well as money orders, forged credit cards, and defendants' e-mail containing lists of stolen credit card account numbers, established the existence of a criminal enterprise in which the individual defendants participated to varying extents. The witnesses, including a United States Secret Service special agent and an investigator from the Manhattan District Attorney's office, explained that while Western Express offered a variety of legitimate services, such as check cashing, mail receiving, money orders, digital currency exchange, and Russian/English translation services, it also acted as an intermediary, or "money mover," providing credit and facilitating transactions for buyers and sellers of stolen credit card data, while earning a commission for each such transaction. The credit card data was obtained by hackers or by other illegal methods, and was then sold through Western Express to buyers such as defendants Latta, Perez, Roach, and Washington, who in turn used that data for such illegal purposes as manufacturing counterfeit credit cards or making fraudulent on-line purchases.

The evidence reflects that Vassilenko, as president of Western Express, made concerted efforts to position Western Express as a preferred agency for "carders," that is, vendors and buyers of stolen credit card data. He did so by making Western Express more than a neutral site for transacting sales; he provided services that would help these individuals successfully carry out their illegal transactions undetected by law enforcement. Vassilenko created and maintained Web sites and Internet forums containing postings about the sale of stolen account information, advertised Western Express's money-moving services, posted messages on preexisting "carder" Web sites and looked into advertising on the Web site CarderPlanet. Then, Western Express employees actively assisted those customers buying and selling stolen credit card data by providing them with credit using unregulated digital currencies such as Egold and WebMoney, arranging exchanges of these digital currencies so that the transactions could be conducted without disclosure of the identities of the parties taking part.

More specifically, the evidence presented to the grand jury showed that Western Express provided Egold (in exchange for other currency) to buyers of stolen credit card data, including

defendants Latta, Perez, Roach and Washington, which digital currency helped them anonymously purchase the stolen data; then Western Express would redeem from the sellers of the stolen data, such as defendants Egor Shevelev and Dzimitry Burak, the Egold that the buyers had paid to them, exchanging it for WebMoney or United States currency. On each transaction, Western Express earned a commission of between two percent and five percent. By arranging for these transactions to be conducted in unregulated digital currencies, which were then exchanged for other unregulated currencies, and by knowingly permitting the transactions to be conducted using aliases, Western Express helped the participants avoid detection by governmental regulatory authorities, while itself profiting at each stage of the illegal process.

Western Express employees also helped the vendors and buyers avoid triggering federal reporting requirements by advising them to make wire transfers in small amounts under a variety of fictitious names. In these ways, Western Express not only failed to combat money laundering and detect suspicious or clearly illegal activity, it actively encouraged, assisted and participated in those activities. Indeed, defendant Vassilenko admitted to an investigator that five percent of his business involved "dirty" money.

█ In sum, the presented evidence shows that Vassilenko began with a legitimate business enterprise engaged in such services as check cashing, mail receiving, money orders, and digital currency exchange, which he then perverted both by attracting buyers and sellers of stolen credit card data to transact their business on his site, and by not only failing to enforce anti-money-laundering protections, but affirmatively providing specialized assistance to these criminals to protect them from detection and encourage their continued use of the site for additional transactions in the future. While the individual defendants acting as either buyers or sellers of stolen credit card data could conduct such illegal transactions in the absence of Western Express—indeed, they continued to conduct such illegal transactions even after Western Express ceased operations—the evidence before the grand jury permitted the conclusion that all the defendants had found it to be to their mutual advantage to utilize and participate in the larger organizational forum and structure provided by Western Express.

This Court is divided on the question of whether the nature of this organization, as indicated by the evidence presented to

the grand jury, constitutes a "criminal enterprise" having an "ascertainable structure" as contemplated by the OCCA. It must be acknowledged that the structure of Vassilenko's enterprise, used by the buying and selling defendants, differs greatly from the way in which the very word "structure" is ordinarily used in the context of organized crime. The "structure" at issue here is, essentially, a Web site; there is no social club or office, no hierarchy of appointed positions. Nevertheless, the criminal enterprise that was formed from the legitimate business known as Western Express served as far more than merely a site at which information thieves could fence stolen goods. Rather, it was molded into a full-service clearinghouse devoted to optimizing illegal transactions involving stolen credit card information.

Examination of cases in which charges of enterprise corruption were upheld, and others in which they were not, helps illustrate how to determine whether criminal activity falls within the OCCA.

Enterprise corruption charges were dismissed in *People v Nappo* (261 AD2d 558, 559 [1999], *revd on other grounds* 94 NY2d 564 [2000]), where the defendants' scheme to import motor fuel from New Jersey to New York without filing reports or paying taxes did not constitute a "structure, business, activity, or continuity of criminal purpose beyond the scope of the criminal incidents alleged in the indictment." Similarly, charges of enterprise corruption were dismissed in *People v Moscatiello* (149 Misc 2d 752 [Sup Ct, NY County 1990]), where it was alleged that the defendants were engaged in a bribery scheme in which each participant played a different role: one defendant directed the enterprise, one was his assistant, and another the "instrument." The court observed that the structure of the individuals' association was "not one with a scope of existence beyond their criminal acts" (*id.* at 756).

The same absence of an association that went beyond the scope of the component criminal incidents was apparent in *People v Yarmy* (171 Misc 2d 13 [Sup Ct, NY County 1996]), where the count of the indictment charging enterprise corruption was dismissed because the alleged criminal activity consisted of a firearms dealer arranging for an unlicensed coconspirator to illegally sell weapons and ammunition, sometimes with the assistance of family members, and the division of the proceeds from the sales. Although the District Attorney's office had argued in *Yarmy* that the enterprise consisted

of the illegal sales and recruitment of new customers aided by an unlicensed coconspirator and others, the court observed that there were actually only two roles in the enterprise: the supplier and the distributor, acting together to their mutual financial benefit, so the scope of the enterprise was no larger than the conduct of the illegal sales themselves. So, although the court in *Yarmy* remarked on the lack of a "hierarchical organization" which it considered "critical to establishing an enterprise" (171 Misc 2d at 17-18), the charged conspiracy also failed by the standard applied by the cases discussed above, in that the scope of its existence did not extend beyond the participants' criminal acts.

In contrast, the requirements of the enterprise corruption statute were held to be satisfied by the business operations considered in *People v Forson* (NYLJ, May 12, 1994, at 29, col 3 [Sup Ct, NY County]). There, the defendants had formed what appeared to function as a legitimate securities dealer operation, but which actually conducted a variety of fraudulent schemes in which the participants stole investors' funds. In denying dismissal of the enterprise corruption charges, the court observed that the defendants shared a common purpose of using their business, Oxford Capital Securities, to defraud members of the investing public, and, importantly, that the "enterprise" went beyond what was necessary to commit the series of acts charged. Rather, one defendant directed the enterprise and set goals, policies, and strategies, with an inner circle to convey his plans and strategies to others, and to fraudulently obtain funds from unsuspecting investors.

The definition of enterprise corruption was also found to be satisfied in *People v Conigliaro* (290 AD2d 87 [2002], *lv denied* 98 NY2d 650 [2002]), where the defendants were members of a gambling organization that ran a sports betting operation, which included a bookmaker who oversaw the operation, a controller who conducted its day-to-day business and maintained bettors' account information, clerks who accepted bets over the telephone, and runners who met with bettors to settle their weekly accounts.

Finally, while *Boyle v United States* (556 US —, 129 S Ct 2237 [2009]) is not controlling here, because it concerned the issue of whether a particular criminal enterprise was covered by the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USC § 1962), its discussion is informative. The petitioner in *Boyle*, one of the participants in a series of bank

thefts, was convicted of participation in a criminal enterprise under RICO. The group who took part in these thefts was "loosely and informally organized," with no "long-term master plan or agreement," and no particular leader or hierarchy; there was a "core group" which was assisted by "others who were recruited from time to time" (556 US at —, 129 S Ct at 2241). The United States Supreme Court upheld the trial court's instruction to the jury that an "enterprise" under RICO could consist of an "association of individuals, without structural hierarchy, form[ed] solely for the purpose of carrying out a pattern of racketeering acts" (556 US at —, 129 S Ct at 2242), and need not "have any particular or formal structure, but it must have sufficient organization that its members functioned and operated in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise" (556 US at — n 1, 129 S Ct at 2242 n 1 [emphasis omitted]). The Supreme Court held that the structure of the enterprise need not be hierarchical, and that to show the necessary structure, the prosecution need only show that the group functioned as a "continuing unit" with a "common purpose" and that it "remain[ed] in existence long enough to pursue a course of conduct" (556 US at —, 129 S Ct at 2245). Importantly, while the Supreme Court observed that the "existence of an enterprise" is a separate element, distinct from the requirement of a pattern of criminal conduct, the existence of an enterprise may sometimes "be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity" (556 US at —, 129 S Ct at 2245).

Unquestionably, the definition of a criminal enterprise to which the OCCA applies does not match that of RICO, and expressly requires that the group's "ascertainable structure" be "distinct from a pattern of criminal activity" (Penal Law § 460.10 [3]). However, the logic behind the *Boyle* Court's observation that RICO does not require the structure to be hierarchical ought to be similarly applicable to the OCCA. There is nothing in the language of the statute that requires the structure of the targeted enterprise to "be so rigid as to resemble the formalistic corporate flow chart" (*People v Wakefield Fin. Corp.*, 155 Misc 2d 775, 785 [Sup Ct, NY County 1992]). Notably, nothing in the statute requires that the "structure" of the enterprise incorporate a "chain of command," let alone "profit sharing," as my colleague suggests. Given that the statute merely requires an "ascertainable

structure," there is no reason to engraft on it that the structure be of the old-fashioned, hierarchical nature. Notwithstanding references to the OCCA's intent "to prosecute organized crime activities on a similar—but more limited—basis than [RICO]" (*see People v Yarmy*, 171 Misc 2d at 16, citing Donnino, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law art 460, at 552-559), the question here is not whether the OCCA is as expansive as RICO, but rather, whether the showing made to the grand jury here satisfies the specific definitional language of the OCCA.

Although the criminal enterprise here was not of a traditional hierarchical sort, the participants worked together, employing a repeating pattern in their transactions that served to maximize the profits of each while minimizing their exposure, with each participant playing a different role: buyers, sellers, and money movers.

While the evidence certainly establishes a series of crimes by individual defendants comprised of purchases and sales of stolen credit card data, along with other related crimes such as money laundering, the business was shown to be more than simply the site at which a series of criminal transactions occur. Rather, Western Express may be said to have built a broader criminal structure, in which each of the defendants played a role. The structure of the criminal enterprise created by Vassilenko, using the framework of Western Express, amounted to more than a series of those individual crimes. Moreover, it was driven by a larger criminal purpose. Western Express positioned itself to serve as much more than an on-line site at which buyers and sellers could conduct their illegal transactions and pay a commission to Western Express. Specifically, there was the overall planning and communications spearheaded by Vassilenko, with the assistance of other company employees, to transform what had been Western Express's initially legitimate business into a hub for criminal activity geared toward maximizing its own and its participants' profits from the theft and use of stolen credit card information and its protection from law enforcement. This creation of a sophisticated, multifaceted criminal enterprise formed to encourage and expand on the criminal transactions upon which it is built is analogous to the gambling organization discussed in *People v Conigliaro* (290 AD2d 87 [2002], *supra*), which operated a sports betting concern that included a variety of participants who together conducted an enormous business.

While the more traditional form of organized crime, such as the gambling operation considered in *Conigliaro*, makes it easy

to infer that the individual participants in the operation necessarily knew of the parts played by the other participants and the structure of the overall enterprise, such an inference may be made even where many of the participants never meet any other participants. The evidence here permits the inference that the individual participants understood the overall criminal structure, and that other individuals—albeit individuals never seen or personally known by each defendant—played other roles in the operation. The evidence points to the conclusion that the organization Vassilenko created out of the original financial services business of Western Express became more than merely a location at which individual criminal transactions occurred; it became a framework that existed to actively encourage more and larger criminal transactions by its participants on an ongoing basis. Recognizing this framework as an ascertainable structure to which the OCCA is applicable does not constitute an expansion of the definition of criminal enterprise so as to, in effect, eliminate the "ascertainable structure" element of the crime.

In enacting the OCCA, the Legislature made a point of remarking that the answer to "the question whether to prosecute under those [already existing] statutes or for the pattern itself . . . will depend on the particular situation, and is best addressed by those institutions of government which have traditionally exercised that function: the grand jury, the public prosecutor, and an independent judiciary" (Penal Law § 460.00). Particularly in view of the findings' reference to the need for discretion (id.), and the statute's particular concern for legitimate businesses being overtaken by criminal enterprises, the showing made by the prosecutor and the findings of the grand jury here should be permitted to stand. The People should be permitted to attempt to prove at trial that each of the defendants took part in the ongoing criminal enterprise that Western Express had become, in violation of the OCCA's enterprise corruption statute. We therefore reverse the dismissal.

Accordingly, the orders of the Supreme Court, New York County (Bruce Allen, J.), entered on or about July 25, 2008, which dismissed the enterprise corruption count against each defendant, should be reversed, on the law, and the counts reinstated. Appeals from orders, same court and Justice, entered on or about March 3, 2009, which denied the People's motion to reargue, should be dismissed, without costs, as taken from nonappealable papers.

ANDRIAS, J.P. (dissenting). The 173-count indictment charges multiple defendants with enterprise corruption in violation of Penal Law § 460.20 (the Organized Crime Control Act [OCCA]) and other crimes which are not at issue in this appeal.* The enterprise corruption charge is based on allegations that defendants comprised an international cybercrime group in which defendant-respondent Western Express, with the knowledge and participation of its president, defendant-respondent Vassilenko, facilitated the Internet sale of stolen credit card data in anonymous transactions between defendant vendors and defendant buyers, including respondents Latta, Perez, Roach and Washington, by advertising on Web sites, buying and selling unregulated digital currencies and directing wire transfers to shell accounts.

Finding that the proof presented to the grand jury would establish that defendants were associated with a criminal enterprise that had "an ascertainable structure distinct from a pattern of criminal activity," as required by Penal Law § 460.10 (3), the majority would reverse Supreme Court's dismissal of the enterprise corruption charge against each defendant-respondent. Because I believe that defendants' combined activities, undertaken for their individual benefit, without any chain of command, profit sharing, or continuity of criminal purpose beyond the scope of the criminal incidents alleged in the indictment, are insufficient to show that they engaged in the type of criminal enterprise covered by the statute, I dissent.

In 1986, the Legislature enacted the OCCA for "the purpose of creating the separate crime [of enterprise corruption] . . . to address the particular and cumulative harm posed by persons who band together in complex criminal organizations" (*see People v Besser*, 96 NY2d 136, 142 [2001]). The statute "focuses upon criminal enterprises because their sophistication and organization make them more effective at their criminal purposes and because their structure and insulation protect their leadership from detection and prosecution" (Penal Law § 460.00 ["Legislative findings"]).

---

* These include conspiracy in the fifth degree (Penal Law § 105.05 [1]); scheme to defraud in the first and second degrees (Penal Law § 190.65 [1] [a], [b]; § 190.60); grand larceny in the second and third degrees (Penal Law § 155.40 [1]; § 155.35); attempted grand larceny in the third degree (Penal Law § 110.00, 155.35); criminal possession of a forged instrument in the second degree (Penal Law § 170.25); and criminal possession of stolen property in the second and fourth degrees (Penal Law §§ 165.52, 165.45 [2]).

"A person is guilty of enterprise corruption when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he:

"(a) intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity" (Penal Law § 460.20 [1] [a]).

A "pattern of criminal activity" is defined as "conduct engaged in by persons charged in an enterprise corruption count constituting three or more criminal acts" committed within a specified time frame (Penal Law § 460.10 [4] [a], [b]). A "criminal act" includes the felonies specified in the statute and conduct constituting a "conspiracy or attempt to commit any of [those] felonies," even if the conspiracy or attempt is a misdemeanor (Penal Law § 460.10 [1] [a], [b]). The criminal acts must be either part of a common scheme or plan or have been "committed, solicited, requested, importuned, or intentionally aided by persons acting with the mental culpability required for the commission thereof and associated with or in the criminal enterprise" (Penal Law § 460.10 [4] [c] [ii]). The People must also prove that the defendant committed the three eligible "pattern acts," either as a principal or an accomplice pursuant to section 20.00 of the Penal Law (Penal Law § 460.20 [2]; *see People v Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*, 250 AD2d 207, 212 [1998], *lv denied* 93 NY2d 877 [1999], *cert denied* 528 US 1081 [2000]).

Penal Law § 460.10 (3) defines "criminal enterprise" as "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents." As stated by one of the statute's authors, Assembly Member Melvin H. Miller, then Chair of the Committee on Codes:

"[t]he members of the Codes Committee felt that the extraordinary sanctions allowed under the Act should be reserved for those who not only commit crimes but do so as part of an organized criminal enterprise . . . For that reason, it was not the sponsors' intent to redefine or sanction anew conduct already punishable under current law . . . Rather, the bill now requires association with an ascertainably distinct criminal enterprise in addition to corrup-

tion of a legitimate enterprise by criminal activity."
(July 16, 1986 letter, Bill Jacket, L 1986, ch 516.)

While the association need not "be so rigid as to resemble the formalistic corporate flow chart" (*People v Wakefield Fin. Corp.*, 155 Misc 2d 775, 785 [Sup Ct, NY County 1992]), an ascertainable structure does not exist where multiple people commit multiple acts, but do not engage in "any structure, business, activity, or continuity of criminal purpose beyond the scope of the criminal incidents alleged in the indictment" (*People v Nappo*, 261 AD2d 558, 559 [1999], *revd on other grounds* 94 NY2d 564 [2000]; *see also People v Besser*, 96 NY2d 136, 143 [2001]; Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 460.20, at 175). An ascertainable structure will be found where there are "planners and managers at the top, and middle and lower level participants executing the scheme—'a system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses' " (*id.* at 176, quoting *Wakefield* at 785; *see also People v D.H. Blair & Co.*, 2002 NY Slip Op 50152[U], *22 [Sup Ct, NY County 2002] ["hierarchical structure with the common purpose" of criminal activity satisfies the requirement]; *People v Cantarella*, 160 Misc 2d 8, 19 [Sup Ct, NY County 1993] ["(t)he structure consisted of a chain of command and profit sharing"]).

Thus, as explained in *People v Pustilnik* (14 Misc 3d 1237[A], 2007 NY Slip Op 50407[U], *6 [Sup Ct, NY County 2007]), an ascertainable structure requires " '[a] system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses' (*People v. Wakefield*, 155 Misc 2d at 785)," something more than and "distinct from any ad hoc association entered into for the purpose of carrying out one or more of the criminal incidents relied upon to establish its existence" (*People v Cantarella*, 160 Misc 2d at 14). Although

> " 'a distinct ascertainable structure does not necessarily require the presence of an organization that is functionally independent of the criminal activity[,] [w]hat is significant is the existence of an enterprise "beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." ' " (*People v D.H. Blair & Co.*, 2002 NY Slip Op 50152[U], *22, quoting *People v Forson*, NYLJ, May 12, 1994, at 29, col 3 [Sup Ct, NY County].)

The proof before the grand jury was that Western Express acted as a "money mover," providing credit and facilitating transactions for buyers and sellers of credit card data stolen by hackers or by other methods. Western Express did so by buying and selling large sums of unregulated digital currencies, such as Egold and WebMoney, which they exchanged for each other and for United States currency. The digital currency provided by Western Express made it possible for buyer defendants, who used aliases, to purchase credit card data anonymously from vendor defendants, and allowed for the laundering of the illegal income. Vassilenko knew that Western Express's clients used aliases, which violated standard anti-money-laundering practices, but made no effort to ascertain their true identities. Western Express employees also used aliases and hid their identities.

Western Express helped the vendors and buyers structure transactions to evade federal reporting requirements by advising that wire transfers be made in small amounts under various names. Vassilenko admitted to an investigator that five percent of his business involved "dirty" money, and that Western Express wired money to dozens of "shell accounts" in Baltic states. Western Express sought to encourage the market for its services by maintaining Web sites that included postings about the sale of stolen account information and advertised its money-moving services.

The buyer defendants purchased stolen credit card data from vendors, by sending Egold via Western Express. Buyer defendants Latta, Perez, and Washington, along with various vendors, made use of online "carding" forums, which advertised the sale of stolen credit card account information. In addition, buyer defendants Latta and Perez committed credit card fraud together, as did Washington and another defendant. When Western Express ceased its operations, buyer defendants Latta, Perez, and Washington continued to purchase stolen credit card information from one of the vendor defendants herein, who continued to accept Egold as payment for the stolen data.

This evidence only established that, by sophisticated means, some of the defendants, in arm's length transactions, sold stolen information and illegitimate services to the other defendants, who acted independently in using the information and services to commit their individual crimes. While the People assert that the "Western Express Cybercrime Group" was "comprised of Buyers, Vendors, Cybercrime Services Providers, and Money

Movers, all of whom made decisions and shared authority over distinct aspects of the enterprise's activities," there is no evidence of any collective decision-making or coordination with respect to the purported enterprise's activities or of any overarching structure of authority or hierarchy in which defendants participated. Accordingly, even when viewed in the light most favorable to the People (*see People v Jensen*, 86 NY2d 248, 251 [1995]), the evidence before the grand jury was insufficient to establish an ascertainable structure (*see People v Nappo*, 261 AD2d at 559; *People v Yarmy*, 171 Misc 2d 13, 19 [Sup Ct, NY County 1996]; *People v Moscatiello*, 149 Misc 2d 752, 756 [Sup Ct, NY County 1990]).

In *Nappo*, the Nappo defendants formed a corporation for the purpose of importing motor fuel oil and conspired to evade payment of state sales taxes. In finding that the defendants were not engaged in a criminal enterprise within the meaning of the OCCA, the Second Department found that "[t]he Grand Jury evidence is insufficient to establish that the respondents engaged in any structure, business, activity or continuity of criminal purpose beyond the scope of the criminal incidents alleged in the indictment" (261 AD2d at 559). In *People v Conigliaro* (290 AD2d 87, 89 [2002]), the Second Department explained that in *Nappo*, "the People failed to establish either an 'existing organized crime entity' or any continuity of existence wherein the said entity was capable of continuing without the participation of [the Nappos]." Here too, even after Western Express ceased its participation, certain vendor and buyer defendants continued on their own to traffic in stolen credit card data, using Egold as payment.

In *Yarmy*, the People alleged that the criminal enterprise included the customers to whom Yarmy unlawfully sold firearms. In rejecting the claim, the court found that the customers'

> "only concern was to obtain firearms illegally, with no intent to further the enterprise. Such a position, if accepted by the court, would be the equivalent of an addict on a street corner who purchased a vial of crack being held accountable for a criminal enterprise that reached to the highest echelon of the Colombian cartels. This clearly was not the intent of the OCCA statute" (*Yarmy* at 19).

Here too, each participant, whether it be a vendor defendant, buyer defendant, or Western Express, was concerned with

furthering their interests alone, not with generating profits to be shared by the other participants.

In *Moscatiello*, which involved a bribery scheme, the court held that

> "[t]he evidence as presented to the Grand Jury shows three individuals engaged in giving or taking bribes and related activities. Beyond the various criminal acts these three people were associated in no structure and certainly not one with a scope of existence beyond their criminal acts. The People have sought, with some imagination and ingenuity, to show the existence of an organization by showing that Moscatiello was the 'director' of the enterprise, Schepis, his 'assistant' and Eckhaus the 'instrument' of the criminal activity. However, this shows little more than that the three people played different roles . . . for the purpose of this activity was to bribe Eckhaus to allow violations of the union rules" (149 Misc 2d at 756).

Similarly, in the matter before us, as Supreme Court found:

> "In essence, the People have described an illegal industry rather than a corrupt enterprise, the criminal parallel of a typical legitimate industry consisting of producers, wholesalers, distributors, retail outlets, and credit suppliers, each of which has a unique but independent role in the industry. Despite the People's great creativity in attempting to describe the defendants' activities, the People's theory of the case (and the evidence) never points beyond long-term, repeated illegal business transactions among parties who stand on equal footing, and who operate independently of each other." (*People v Latta*, NYLJ, Aug. 1, 2008, at 26, col 1, 2008 NY Misc LEXIS 4967, *4-5 [Sup Ct, NY County 2008].)

In seeking to expand the definition of a criminal enterprise, the majority goes to great lengths to describe how the Internet has provided an extraordinarily useful new tool for criminals to perpetrate crimes in an entirely new way. While this may be true,

> "[t]he governing rule of statutory construction is that courts are obliged to interpret a statute to ef-

fectuate the intent of the Legislature, and when the statutory 'language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of [the] words' used. Equally settled is the principle that courts are not to legislate under the guise of interpretation." (*People v Finnegan*, 85 NY2d 53, 58 [1995], *cert denied* 516 US 919 [1995] [citations omitted].)

Thus, as stated in McKinney's Consolidated Laws of NY, Book 1, Statutes § 73,

"A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all of the problems and complications which might arise in the course of its administration; and no matter what disastrous consequences may result from following the expressed intent of the Legislature, the Judiciary cannot avoid its duty." (Comment, at 148; *see also Matter of Tina Marie W.*, 87 AD2d 988 [1982].)

Accordingly, if there is a need to address the unique dangers posed by Internet crime, and the new ways in which individuals or entities interact with each other to commit those crimes, it is for the Legislature to do so. It is not for the courts to expand the definition of criminal enterprise beyond its clearly defined parameters in a manner that would for all intents and purposes eliminate the ascertainable structure required to establish a criminal enterprise under Penal Law § 460.10 (3). Indeed, as the majority notes, while federal law enforcement has prosecuted "carding" by charging a number of individuals with existing crimes such as "conspiracy, identity theft, trafficking in illegal information, credit card fraud, and money laundering . . . , in some respects, new criminal legislation such as the federal Computer Fraud and Abuse Act (18 USC § 1030) has been determined to be necessary to effectively combat such crime."

Contrary to the majority's position, the United States Supreme Court decision in *Boyle v United States* (556 US —, 129 S Ct 2237 [2009]) does not mandate a different conclusion. In *Boyle*, the Supreme Court considered "whether [under the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USC § 1961 *et seq.*)] an association-in-fact enterprise . . . must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages" (556

US at —, 129 S Ct at 2241 [internal quotation marks omitted]). While agreeing that "an association-in-fact enterprise must have a structure," the Supreme Court held that "[f]rom the terms of RICO" this requires evidence of (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the purpose of the enterprise (556 US at —, 129 S Ct at 2244), but does not require a hierarchical structure or fixed roles for its members, a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies (556 US at —, 129 S Ct at 2245).

However, under RICO an " 'enterprise' " includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" (18 USC § 1961 [4]). The Supreme Court has stated that this language is expansive and should be interpreted liberally (*Boyle*, 556 US at —, 129 S Ct at 2243). Accordingly, the Supreme Court has found that "an enterprise includes any union or group of individuals associated in fact" (*United States v Turkette*, 452 US 576, 580 [1981]) and that RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct" (*id.* at 583).

In contrast, Penal Law § 460.10 (3)'s definition of criminal enterprise expressly includes the requirement that the group be "associated in an ascertainable structure distinct from a pattern of criminal activity." The New York Legislature has cautioned that the definitions of the statute's terms "should be given their plain meaning, and should not be construed either liberally or strictly, but in the context of the legislative purposes set forth in these findings" (Penal Law § 460.00; *People v Yarmy*, 171 Misc 2d at 16) and that "[b]ecause of its more rigorous definitions, this act will not apply to some situations encompassed within comparable statutes in other jurisdictions" (Penal Law § 460.00). Thus, the purpose of the OCCA is "to arm State prosecutors with the ability to prosecute organized crime activities on a similar—but more limited—basis than [RICO]." (*People v Yarmy*, 171 Misc 2d at 16.) Accordingly, *Boyle*, where the Supreme Court stated that "[w]e see no basis in the language of RICO for the structural requirements that petitioner asks us to recognize" (556 US at —, 129 S Ct at 2245), is not dispositive of the issues before us.

In any event, even under the relatively undemanding standard of *Boyle*, there are "situations in which proof that individu-

als engaged in a pattern of racketeering activity would not establish the existence of an enterprise" (556 US at — n 4, 129 S Ct at 2245 n 4) and the requisite structure cannot be found without some evidence of relationships among those associated with the enterprise that includes some form of concerted, coordinated, decision-making regarding the common purpose of the criminal enterprise. Here, the evidence before the grand jury did not satisfy this burden.

In asserting that an ascertainable structure may be found, the majority maintains that Vassilenko began with a legitimate business enterprise which he perverted by attracting buyers and sellers of stolen credit card data to transact business on his Web site by providing affirmative assistance in the form of a full-service clearinghouse devoted to optimizing illegal transactions involving stolen credit card information. However, the majority acknowledges that defendant vendors and buyers could have conducted their illegal activities without Western Express. While these defendants may have found it to be beneficial to utilize Western Express's Web site and services, it does not alter the fact that there has been no showing other than they acted independently, without a broader structure beyond the individual crimes perpetrated.

In sum, the fact that Western Express may have acted as an intermediary or "money mover" providing credit and facilitating transactions for buyers and sellers of stolen credit card data, earning a commission for each transaction, or aspired to be "carders' " facilitator of preference, did not in and of itself create an ascertainable structure as required by Penal Law § 460.10 (3). Western Express was in essence no more than the equivalent of a common fence, taking stolen property from independent thieves and selling it to buyers looking for an illicit deal. Although defendants may all have been in the same industry, the vendors, buyers and Western Express each operated at arm's length for their own benefit, not as an enterprise with a shared purpose. Vendors and buyers could conduct their transactions without Western Express and in fact certain of them continued to do so after Western Express ceased operation.

Accordingly, I would affirm the orders of the Supreme Court, New York County that dismissed the enterprise corruption count against each defendant-respondent, and that granted the People's motion to reargue and adhered to the original decision.

ACOSTA and ABDUS-SALAAM, JJ., concur with SAXE, J.; AN-DRIAS, J.P., and MANZANET-DANIELS, J., dissent in a separate opinion by ANDRIAS, J.P.

Orders, Supreme Court, New York County, entered on or about July 25, 2008, reversed, on the law, and the enterprise corruption counts reinstated. Appeals from orders, same court, entered on or about March 3, 2009, dismissed, without costs, as taken from nonappealable papers.

---

Motions of Douglas Latta and Angela Perez, also known as Anna Ciano, to dismiss appeal denied.

---

Motion of John Washington to dismiss appeal granted.