*586 We exercise our discretion in the interest of justice to modify defendants’ sentences so that the sentences for the remaining counts run concurrently. Pursuant to CPL 470.15 (6) (b), this Court has “broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances,” even with respect to an otherwise legal sentence (see People v Delgado, 80 NY2d 780, 783 [1992]). This power may be exercised in the interest of justice and without deference to the sentencing court (id.). Where the court deems an otherwise legal sentence to be excessive, it may “substitute [its] own discretion even where a trial court has not abused its discretion” (People v Edwards, 37 AD3d 289, 290 [1st Dept 2007], lv denied 9 NY3d 843 [2007], citing People v Rosenthal, 305 AD2d 327, 329 [1st Dept 2003]).
In this case, the trial court sentenced Barone to an aggregate term of 5 Vs to 16 years, indicating that the sentences on four counts — including offering a false instrument for filing, attempted grand larceny, and scheme to defraud — should run consecutively, but concurrently with the sentences on the remaining counts, including the sentence of 5Va to 16 years for enterprise corruption. Similarly, the trial court sentenced Rancharla to an aggregate term of 7 to 21 years, indicating that the sentences on six counts — including offering a false instrument for filing, falsifying a business record, and scheme to defraud — should run consecutively to each other. Rancharla’s 7-to-21-year sentence for enterprise corruption along with the sentences for the remaining counts, were to run concurrently.
*587 Thus, the trial court meted out the sentences in a manner such that even if the enterprise corruption convictions were vacated, the defendants would still serve equivalent aggregate terms. As defendants point out, the trial court apparently felt that such sentences were warranted in order to “send a message” to “ ‘the construction industry in New York City [which] over the decades has been rife with corruption.’ ”
In light of our decision to vacate the enterprise corruption convictions, we find that the imposition of consecutive sentences is unduly harsh. “[F]airness of the criminal justice system requires . . . some measure of equality in the sentences meted out to defendants who commit the same or similar crimes” (see People v Schonfeld, 68 AD3d 449, 450 [1st Dept 2009] [internal quotation marks omitted]; People v Andrews, 176 AD2d 530 [1st Dept 1991], lv denied 79 NY2d 918 [1992] [although defendant was properly sentenced to greater term than those imposed upon codefendants who pleaded guilty, the concept of proportionality of punishment warranted a reduction of his sentence]; People v Slobodan, 67 AD2d 630, 630 [1st Dept 1979] [sentence reduced where the difference between defendant’s sentence and those of his codefendants who did not go to trial was “so great as to raise serious questions as to whether (defendant was) not being penalized for going to trial”]).
Here, in return for his cooperation with the prosecution, co-defendant Thumma, who affixed his engineer’s stamp to hundreds of mix design reports, received a misdemeanor conviction and a probationary sentence and will likely retain his engineering license. Similarly, codefendant Porter pleaded guilty to a single felony count and was sentenced to probation. The defendants’ consecutive sentences for the same or similar crimes, all non-violent class E felonies, are strikingly disproportionate and should be reduced in the interest of justice.
Catterson, J.P., Richter, Abdus-Salaam and Román, JJ., concur in part in Part I of a separate memorandum by Catterson, J.P., Catterson, J.P., dissents in part in Part II of a separate memorandum as follows:
Part I
In this case involving alleged falsified test and inspection reports for landmark projects in the New York City metropolitan area, we find that defendants’ convictions for enterprise corruption were not supported by legally sufficient evidence and were against the weight of the evidence. Relying on pure conjecture bolstered by empty rhetoric, the People failed to produce any evidence that either defendant knew that test results and inspection reports were fabricated, much less that the defendants spearheaded a criminal enterprise.
*588 The record reflects that in 1995, defendant V Reddy Rancharla joined Testwell Craig, a construction material testing company, as its laboratory director. Rancharla acquired the company three years later, renaming it Testwell Laboratories, Inc. (hereinafter referred to as Testwell). Testwell was considered the preeminent material testing laboratory in the New York area. Both public and private builders relied on its test reports and certifications about the strength of concrete and the quality of steel in structures built in the city.
In October 2008, a New York County grand jury returned an indictment against Testwell, its owner and chief executive officer Rancharla, its vice-president of engineering, defendant Vincent Barone, and several other employees, charging various crimes including enterprise corruption, scheme to defraud and offering a false instrument for filing. The crimes were based on five separate criminal schemes. At issue in this appeal are three schemes involving concrete and steel testing of major, high-profile projects including Yankee Stadium, the Freedom Tower, and Jet Blue facilities at JFR Airport.
Rancharla was charged in connection with the “mix design scheme,” the “steel inspections scheme” and the “certified inspectors” scheme, but not in the “field tests scheme” or the “compressive/flexural strength alternations scheme.” Barone was charged only in the “steel inspections scheme” and “compressive/flexural strength alternations scheme.”
In the “mix design scheme” the People alleged that Testwell, rather than utilizing the “preliminary tests method,” one of three methods authorized by the New York City Building Code (Administrative Code of City of NY, tit 28, ch 7) to calculate the strength of concrete needed for a project, created a formula believed to meet project specifications, and then used a computer program to generate expected compressive strength tests. Thus, the mix design reports were the product of a computer algorithm, not actual testing. The People contended that Rancharla stamped and signed the improperly-prepared “mix design” reports and urged Testwell’s laboratory director, Dr. Kaspal Thumma, to do the same.
In the “compressive/flexural strength alterations scheme” the People alleged that compressive strength test results were altered by Testwell employees before the results were sent out for review, and that Barone authorized changes to certain test results related to one project through faxes sent from his assistant. The People’s theory was that the altered test results were designed to eliminate anomalous outcomes so that the projects’ engineers would not question the results. At trial, the prosecu *589 tion relied on testimony from Ana Murthy, an employee in the concrete department, and on documents seized from Testwell’s offices to identify who altered test results.
The “steel inspections scheme” charges arose from steel inspections performed by two Testwell inspectors in 2007 for the Dormitory Authority of New York at a South Carolina steel fabrication plant. The People alleged that Testwell double-billed for the inspectors’ work.
Kancharla was convicted of all the mix design counts and one of the 22 “steel inspections scheme” charges, and was acquitted of the “certified inspectors scheme” charge. He was also convicted of being the leader of the “Testwell Group,” which was allegedly a criminal enterprise. Barone was convicted of five counts in the “compressive/flexural strength alterations scheme” and seven counts in connection with the “steel inspections scheme.” He was also convicted of enterprise corruption.
In our view, the evidence necessary to establish the elements of enterprise corruption was wholly missing from the People’s proof. Indeed, the entire theory of the People’s case is made of conjecture, surmise and innuendo rather than proof beyond a reasonable doubt. A person is guilty of enterprise corruption when that individual is employed by or associated with a criminal enterprise and intentionally participates in the affairs of that enterprise by engaging in a pattern of criminal activity involving at least three criminal acts. (Penal Law § 460.20 [1], [2]; see People v Besser, 96 NY2d 136 [2001]; People v Western Express Intl., Inc., 85 AD3d 1 [1st Dept 2011], revd 19 NY3d 652 [2012].)
In Besser, the Court of Appeals held that “Penal Law § 460.20 was plainly intended to reach conduct that was not already subject to criminal prosecution {see, Bill Jacket, L 1985, ch 516). The emphasis of the legislation was not on the quantity or nature of the myriad, isolated criminal activities underlying the new offense — conduct adequately addressed elsewhere in the Penal Law. Instead, it ‘focusefd] upon criminal enterprises because their sophistication and organization make them more effective at their criminal purposes and because their structure and insulation protect their leadership from detection and prosecution’ (Penal Law § 460.00). Thus, the purpose of creating the separate crime was to address the particular and cumulative harm posed by persons who band together in complex criminal organizations.” (96 NY2d at 142 [emphasis added].)
A “criminal enterprise” has also been defined as “a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a *590 pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents.” (Penal Law § 460.10 [3]; see Western Express, 85 AD3d at 6-7; People v Yarmy, 171 Misc 2d 13, 16-17 [Sup Ct, NY County 1996].) Thus, a criminal enterprise consists of three elements: (i) a common purpose; (ii) an ascertainable structure distinct from a pattern of criminal activity; and (iii) a continuity of existence, structure and criminal purpose. (See Western Express, 85 AD3d at 7.)
In Western Express, a majority of this Court upheld the enterprise corruption counts on the ground that the defendants “transformfed] what had been [a] legitimate business into a hub for criminal activity geared toward maximizing . . . profits from the theft and use of stolen credit card information.” (85 AD3d at 13.) The Court of Appeals recently reversed, finding that “[t]here [was] no hint that [the participants] . . . were somehow connected to the workings of a structured, purposeful criminal organization.” (19 NY3d at 659.)
The Western Express decision is particularly instructive in that it reiterates that the People must prove that there is a “common purpose” and an “ascertainable” hierarchical structure. The Court of Appeals, quoting the dissent at this Court, specifically noted that although there was a pattern of illegal activity, there was no “ ‘evidence of any collective decision-making or coordination with respect to the purported enterprise’s activities or of any overarching structure of authority or hierarchy in which defendants participated.’ ” (19 NY3d at 657, quoting 85 AD 3d at 19 [Andrias, J., dissenting].) The Court concluded that the enterprise corruption indictments should have been dismissed because there could be no reasonable inference of an “enduring structurally distinct symbiotically related criminal entity with which [defendants] were purposefully associated.” (19 NY3d at 660.)
Other decisions on continuing criminal enterprise similarly rely on evidence of a defendant’s purposeful participation in a distinct hierarchy. In People v Forson (NYLJ, May 12, 1994 at 29, col 3 [Sup Ct, NY County 1994]), the defendants formed a business, Oxford Capital Securities, that “stole vast sums” of money “through a variety of fraudulent [securities schemes].” The testimony showed that “Forson was at the top of the hierarchy and directed the entire criminal enterprise” — that he set the goals, policies, and strategies for Oxford — and that other defendants formed an “inner circle” to “execute his directives and to relay them to those below in the enterprise.” (Id.) In People v D.H. Blair & Co., Inc. (2002 NY Slip Op 50152[U], *591 *22-23 [Sup Ct, NY County 2002]), the defendants operated a securities “boiler room.” through a “hierarchical structure” with “the top of the structure planning the objectives of the enterprise and directing how the objectives would be achieved, and the middle and bottom levels engaging in activities to carry out the scheme.” In People v Pustilnik (14 Misc 3d 1237[A], 2007 NY Slip Op 50407[U] [Sup Ct, NY County 2007]), the indictment alleged a criminal enterprise bent on defrauding no-fault insurance carriers, with Pustilnik and his mother “at the top of the structure . . . establishing], planning] and directing] the accomplishments of its illegal goals” and others “carrying out [their] criminal plan.” (2007 NY Slip Op 50407[U], *6.) Finally, in People v Marquez (NYLJ, July 22, 1996 at 25, col 6 [Sup Ct, NY County 1996]), Raymond Marquez “controlled and managed a sophisticated gambling syndicate,” supervising approximately 100 employees. Marquez was “[a]t the top of the hierarchy”; his associates called him “Boss”; “[o]n a continuing basis he set the goals, policies and strategies of the organization”; and the operation of each gambling spot was “centralized under his direction.”
Here, as in Western Express, there is “no proof of concerted activity from which a petit jury might reasonably have gathered that the appellants were knowing participants in the affairs of a ‘criminal enterprise.’ ” (19 NY3d at 660.) Defendant Rancharla asserts, and we concur, that the People failed to introduce any evidence that Rancharla knew that anyone at Testwell altered the results from the compressive tests or that the field test results from the Yankee Stadium project were fabricated. Similarly, the People failed to introduce evidence that Rancharla knew that there was any problem with the inspection reports for the John Jay project or that the certifications submitted to the School Construction Authority were inaccurate. There is also no evidence that Rancharla discussed any alleged illegal activity with anyone at Testwell but for an extremely brief exchange sometime in 2004 with Thumma concerning the mix design reports. Absent this proof, the enterprise corruption counts cannot stand.
It appears that the People relied on two witnesses to make out the charge of enterprise corruption: Thumma and Raren Connelly. Connelly testified about Testwell’s website and newsletters. This testimony was seemingly introduced to show Testwell’s corporate hierarchy. Thumma effectively negated Connelly’s testimony when he testified that the website was “totally out of date.” Moreover, Thumma’s testimony is far more important for what it did not say. While Thumma stated *592 that there were regular meetings of Testwell’s management, Thumma did not testify that at any meeting at Testwell there was any discussion related to any of the schemes described above.
The People offered no proof that Rancharla, Barone, or Testwell encouraged or expanded any criminal transactions. They adduced no proof that anyone encouraged “more and larger criminal transactions.” Simply put, the People failed to introduce any evidence of a leadership structure, overall planning of the criminal enterprise, or any communications between Rancharla, Barone, and any of the Testwell employees in furtherance of the criminal enterprise as required by the precedent cited above. Astoundingly, there was no testimony that any employee of Testwell ever spoke with Rancharla or Barone about the different crimes other than the one tangential conversation that Rancharla had with Thumma.
In the People’s brief on appeal and at oral argument, the People offered a series of wholly unsupported arguments and significant misrepresentations of the record to sidestep the absence of proof on the criminal enterprise issue. The People contended that Testwell’s “computer programming, the vagueness about [its] corporate titles and responsibilities, [and its] careful crafting of correspondence . . . are signs of an enterprise that has banded together to ensure that [its] crimes [would be] undetected.”
The People repeatedly pointed to Testwell’s computer system, stating that Rancharla “personally installed [a] ‘state of the art’ computer system” that “was programmed to support and help hide the data-tampering fraud.” The People failed to provide any record citation either in their brief on appeal or when pressed at oral argument for what defendant correctly characterizes as an outlandish claim. While there was testimony that Testwell’s computer system did not allow one to determine who had altered data, there was no evidence of any kind that the computer system was purposefully programmed to “hide” data tampering or that Rancharla had any role in the programming.
We agree with Rancharla that it is one thing to draw inferences from the facts and another thing for the People to simply invent facts in an attempt to satisfy the Western Express standard. The only testimony on Rancharla’s involvement with Testwell’s computer system is as follows:
“Q: And were there other system upgrades to the computers while Mr. Rancharla owned the company?
“[Thumma]: I mean the computer system itself has grown *593 from a simple recording of dispatch data and test data to making things more automatic in terms of generating reports, generating reports, sending them and sorting them and also ability to email them.
“Q: So all these developments happened under Mr. Rancharla’ s ownership?
“[Thumma]: Yes.”
The People also assert that Testwell’s corporate titles and responsibilities were kept vague to “camouflage [its] crimes and blur responsibility for them.” The People contend that Edward Porter’s title “was published on Testwell’s website as assistant laboratory manager despite the fact that he had nothing to do with the lab.” However, the People put forth no evidence that any engineer doing business with Testwell was deceived by Porter’s title or that anyone even considered the issue. In any event, the record does demonstrate that Porter worked with Testwell’s laboratory whenever he prepared trial mixes.
Finally, the People claim that “Testwell’s correspondence was larded with the Testwell ‘we’ — a usage that allowed top-tier members like Rancharla and Barone to appear to be taking a personal hand at resolving a client’s ‘issues’ even while they laid the foundation for a later claim that they bore no responsibility for the falsehoods festooning their correspondence.” Once again, the People offer no record citation for this claim.
All of these specious claims are made to bolster the People’s theory on appeal that the “ ‘common purpose’ behind many of [Testwell’s] crimes was to cover up the shoddy quality of Testwell’s understaffed . . . and often unqualified field inspectors and thereby protect the millions of dollars Testwell brought in from these operations on even a single project.” That contention is simply unsupportable by any fair view of the evidence of record.
The only evidence that Testwell’s inspectors were “unqualified” was the fact that two of its employees worked for the School Construction Authority without the proper certificates for one day each. Thus, the People’s use of “often unqualified field inspectors” is a hyperbolic argument, once again, calculated to convey to this Court that the Western Express standard has been met by proof in this case. This empty rhetoric is further refuted by the scale of Testwell’s legitimate business when compared with the alleged profits from the various schemes. Testwell’s total revenue in 2008 was approximately $20 million. Even were we to accept everything the prosecution contends as true, the revenue from criminal conduct in 2008 did not exceed $100,000, or .5%.
*594 John Klein of Silverstein Developers gave a fairer assessment of Testwell’s work. When the prosecutor asked him how Testwell’s concrete inspectors had performed on the River Place II project, he said this: “They did a very good job. I had inspectors there, I never had to call to ask for inspectors to show up. The inspectors were always there on time. I never had to wait for an inspector to pour cylinder. [Mr. Rancharla] did a great job.”
The dissent on the finding that the defendants’ convictions for enterprise corruption were not supported by legally sufficient evidence and were against the weight of evidence (hereinafter referred to as dissent), contends that “it is frequently the case that legitimate corporations may ‘both len[d] their corporate form, hierarchy and operations to criminal enterprises which flourish[ ] within their corporate structure.’ ” (People v Joseph Stevens & Co., Inc., 31 Misc 3d 1223[A], 2011 NY Slip Op 50808DJ], *40 [Sup Ct, NY County 2011].) While that may be correct as a legal aphorism, it certainly is no substitute for proof beyond a reasonable doubt. As detailed above, there simply was no such proof in the People’s case, unlike the facts of Joseph Stevens & Co. In that case, the People sought to prosecute a broker-dealer firm that was accused of bilking 800 clients out of over $6 million in unauthorized commissions through 5,000 trades. Unlike the paucity of proof in this case, in Joseph Stevens & Co., the People established that the company created a series of stocks, manipulated the trades, and sought solely to profit on the commissions at their own clients’ expense. All of the traders were part of the company-wide scheme to manipulate the market and the trading to maximize the commissions to the company.
The dissent’s recitation of the evidence against Rancharla is also insufficient. Other than Kancharla’s single conversation with Thumma described above, no evidence was put forward that Rancharla instructed anyone at Testwell to: alter any compressive test results, alter or fabricate field test results on the Yankee Stadium project, fabricate or falsify steel inspection reports on the John Jay project, or indeed commit any crime whatsoever. Furthermore, the dissent provides no record citation to prove any of these supposed criminal acts perpetrated by Rancharla.
Similarly, there is no proof of record that Barone altered any test results. The People’s own forensic investigation, relied upon by the dissent, established that Barone did not even have access privileges for the data at issue. Therefore, the dissent is left with relying on the testimony of Ms. Murthy about how she was *595 instructed to alter test data. However, the Murthy testimony does not support the People’s position.
Murthy testified that she altered data on the concrete tests at Caruso’s behest and the People submitted numerous emails that corroborated that testimony. Murthy never spoke with Rancharla about the data alterations. The only testimony linking Barone to Caruso’s extensive alteration was as follows:
“ADA: So when Mr. Caruso was gone, Mr. Barone would review and employ a similar procedure like you talked about with Mr. Caruso?
“Murthy: Not too many times, but I don’t remember, but that was the procedure that was followed.
“ADA: Okay. So other than sort of having the supervisor check the low breaks and make a decision, did you receive any instructions from Mr. Barone about changing numbers.
“Murthy: I would receive fax from the Queens office.” (Emphasis added.)
The People’s position with regard to Barone did not improve with additional questioning. Ms. Murthy later testified that she changed test results for Caruso but she only changed data for Barone after receiving faxes for the Jet Blue project:
“ADA: And why did you make these changes, why did you change test data?
“Murthy: Because my manager instructed me to do that.
“ADA: And why didn’t you question him?
“Murthy: Testwell is a reputable company, they’re in the business for a long time and my managers were professional engineers and I trusted them.
“ADA: And when you say your managers, who are you referring to?
“Murthy: Mr. Caruso and through the faxes Mr. Barone” (emphasis added).
Despite the purported clarification, the People in summation paraphrased Murthy’s ambiguous testimony and overstated its meaning: “Don’t take my word for it, ask for Murthy’s read back, she said it. She said Vincent Barone would check and authorize changes when Alfredo Caruso was not available.”
It appears that the dissent has adopted the People’s argument in summation and on appeal. But rather than limiting the People’s position to the Jet Blue counts in the indictment, the dissent implies that it is evidence of a continuing criminal enterprise. Even if we were to accept that a handful of faxes concerning the alteration of data is sufficient to sustain a charge *596 against Barone, it is wholly deficient as proof against Kancharla or Testwell. We reiterate that no witness testified that Kancharla ever discussed these faxes with Barone or Caruso or that Kancharla even knew about the practice.
Part II
I must respectfully dissent from that part of the majority opinion that upholds the remaining convictions (ManzanetDaniels, J., joined by Richter, AMus-Salaam and Román, JJ.). In my view, the trial court made significant errors in evidentiary rulings which tainted the entire proceeding before the jury. Because these rulings, along with the People’s unsupported (and now vacated) enterprise corruption counts, deprived the defendants of a fair trial, I would remand for a new trial on the remaining counts in the indictment.*
It is important to recognize that the enterprise corruption counts allowed the People to join five separate criminal schemes into one prosecution. Kancharla was not charged in two of the schemes and venue in one of them was in New York County only as a pattern act. Similarly, Barone was not charged in all of the separate criminal schemes such as the mix design and field test schemes.
The prosecution relied heavily on Testwell being a criminal enterprise. The People told the jury that “fraud [was] thoroughly entrenched at Testwell”; that “fraud became the master plan”; that at Testwell “it was fraud as a deliberate business strategy”; that “every engineer abides by [the City Code] . . . except the ones at Testwell”; that “at Testwell a PE’s license was . . . a license to steal”; and that “[t]hese crimes work together [and] ha[ve] a cadence . . . and they all conform to a pattern of criminal activity.”
This use of Testwell as a criminal enterprise allowed the People to link for the jury all of the individual defendants to crimes with which they were not charged. In summation, the People stated that “[t]he details of this scheme were delegated by Reddy Kancharla to his top lieutenants, Vincent Barone, and Alfredo Caruso who in turn enlisted others to help them. This scheme is part of the way they covered up the false mix design reports and the incompetent and skipped field testing in the first two catch points.”
Similarly, “[n]ot only a new crime in and of itself, but part of the cover up, a way of being responsive without being truthful, a way of wriggling out of difficulty instead of coming clean. . . .
*597 “Look at all the engineers that stamp things that they knew were not true: Kaspal Thumma, Michael Sterlacci, Nancy Phillips, Vincent Barone, and Reddy Rancharla in two states and it’s not as if these mix design reports were meaningless pieces of paper that were thrown into a file somewhere. It’s not as if Reddy Rancharla didn’t know where these reports would go or what they would be used for. Reddy Rancharla knew exactly where they went.
“Remember, as I just mentioned, he held the concrete license, he was the face of Testwell, he dealt with clients like Jack Rlein.”
The Second Department’s recent decision in People v Colletti (73 AD3d 1203 [2d Dept 2010], lv denied 15 NY3d 772 [2010]) is instructive in this regard. In Colletti, the indictment charged the defendant with, inter alia, participating in the Genovese-Bonanno gambling organization. However, at trial the prosecution repeatedly referred to the Colletti gambling organization. The Second Department reversed and vacated the conviction on the criminal enterprise counts, citing United States v Weissman (899 F2d 1111 [11th Cir 1990]) for the proposition that the defendant was indicted for associating with one criminal enterprise but the proof at trial repeatedly and impermissibly referred to the defendant’s association with a different criminal enterprise. However, the Court then reversed the conviction on the remaining counts as well: “[S]ince the various offenses of which the defendant was convicted are factually intertwined with each other, and the references to organized crime and to the activities of various crime families pervade the record, reversal and a new trial as to all of the counts is appropriate.” (73 AD3d at 1207-1208.)
In my opinion, any viable defenses that Rancharla and Barone had to the crimes that they were actually charged with were consumed by the vision conjured by the People of Testwell as a continuing criminal enterprise.
I would also find that the trial court made two evidentiary rulings that were in error and greatly prejudiced Rancharla’s defense. To demonstrate that he had no intent to defraud in the mix design scheme counts, Rancharla sought to explain to the jury that it had become an industry practice to create mix designs that did not adhere to the Building Code’s preliminary tests method.
To that end, prior to the start of trial, Rancharla moved to introduce proof that numerous other testing laboratories employed the same approach as Testwell in their preparation of mix design reports. Rancharla argued that evidence of his good *598 faith lay in showing that Testwell was using the same approach as its competitors, namely they reported estimated “breaks” not actual ones. The motion set out to establish that at least eight companies followed such an approach.
However, the trial court excluded the evidence on the grounds that “on the issue of intent . . . the fact that Rancharla knew the other companies were preparing [reports] in the same manner [is] irrelevant.” On appeal, the People amplify this holding by arguing that this evidence showed only that the companies were “guilty of the same form of fraud.” The trial court’s ruling was, in my opinion, a grievous error that a majority of this Court does not even address.
It is well established that scienter is an element of a scheme to defraud. (People v Korsen, 167 AD2d 180 [1st Dept 1990], lv denied 77 NY2d 962 [1991].) Further, as Rancharla correctly asserts, relying on People v Kisina (14 NY3d 153, 160 [2010]), it is well settled that a defendant should be permitted to offer any evidence which bears directly on his intention to defraud.
Indeed, numerous courts have permitted defendants to introduce evidence of industry practice to show a lack of criminal intent. (See e.g. Newton v Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F3d 266, 273 [3d Cir 1998], cert denied 525 US 811 [1998] [evidence of industry practice “could, of course, be regarded by a trier of fact as probative of the defendants’ state of mind”]; United States v Seelig, 622 F2d 207, 216 [6th Cir 1980], cert denied 449 US 869 [1980] [evidence of routine procedures of pharmacists should have been admitted on issue of good faith]; United States v Riley, 550 F2d 233, 236 [5th Cir 1977] [“(w)hile a general practice is not an absolute defense to criminality we think the wiser . . . approach is to let the jury consider the practice in determining whether (the defendant) intended to . . . defraud”].)
In this case, the harm from the ruling was compounded by the testimony of Thumma, Testwell’s laboratory director who was called by the prosecution as a cooperating witness. The jury specifically asked to hear the transcript of Rancharla’s reply to Thumma about computer generated results being a standard industry practice. Without any other evidence, the jury could have inferred that the reference to “industry practice” was a lie intended to induce Thumma to go along with the practice. Hence, a fact that Rancharla sought to establish as true became evidence for the prosecution, and defendant had no opportunity to counter that impression.
The trial court also excluded evidence showing that the concrete contractors who purchased the mix design reports were *599 well aware that Testwell was not following the preliminary tests method. Rancharla sought to introduce evidence that concrete contractors regularly requested that Testwell produce mix design reports in a few days’ time, thus acknowledging that the preliminary tests method was not being followed.
The People argue that because the contractors were a couple of steps removed from their victims, the contractors’ knowledge of the fraudulent nature of the reports had no bearing on whether the victims were duped. The court excluded the evidence on the ground that the concrete contractors were “unindicted coconspirators.” I agree with defendants that in so doing the court committed reversible error. Again, a majority of this Court ignores this issue.
The evidence was offered to show that Testwell was not hiding the fact that the reported breaks were estimated rather than actual, thus showing open conduct rather than fraud and deceit. Rather than allow the jury to hear the evidence and give it appropriate weight, the trial court took judicial notice that a whole segment of the construction industry was an accessory to crime. In my view, this was an impermissible finding. (See Barker & Alexander, Evidence in New York State and Federal Courts § 2.2 [5 West’s NY Prac Series] [“(t)he doctrine of judicial notice ... is based on the principle that some matters of fact are so generally well established in the world outside the courtroom that the taking of evidence would be unnecessary and inefficient”].) Consequently, I would reverse and remand for a new trial.
Richter, Abdus-Salaam, Manzanet-Daniels and Román, JJ., concur in part in Part I of a separate memorandum by Manzanet-Daniels, J.; Manzanet-Daniels, J., dissents in part in Part II of a separate memorandum as follows:
Part I
Rancharla challenges the sufficiency of the evidence supporting his conviction of the counts pertaining to the falsified mix design reports. With respect to the first-degree scheme to defraud count, it is true that Testwell was paid by the concrete suppliers, who would have been aware that no testing was being performed. Testwell was not directly paid by the victims, who were the developers funding the projects. Nevertheless, the evidence supported the conclusion that the victims’ money indirectly would be used by the concrete supplier to pay for the testing, since the cost of the testing would be built into the concrete supplier’s contract, along with its other expenses. Thus, the evidence established that defendants obtained at least $1,000 from one or more of the victims of the scheme (see Penal Law § 190.65 [1] [b]).
*600 Rancharla raises issues regarding the geographical jurisdiction of New York County with respect to the offering a false instrument for filing counts. There was evidence that copies of the mix design reports were distributed to the developer, the architect, the construction manager and the engineer of record, and that the Port Authority, which had its main office in New York County, acted as the regulatory agency for all projects on its property, and received all regulatory filings. This was sufficient to prove venue in New York County by a preponderance of the evidence (see People v Ribowsky, 77 NY2d 284, 291-292 [1991]). However, the evidence failed to establish, with respect to the fraudulent reports filed with the Metropolitan Transportation Authority pertaining to a bus depot project, that the reports had been filed in New York County. Accordingly, Rancharla is entitled to vacatur of his convictions on counts 12 and 13 as originally numbered in the indictment.
We reject Barone’s challenges to the sufficiency and weight of the evidence supporting his convictions pertaining to the compression/flexural strength alteration scheme. Barone acknowledged that codefendant Caruso directed Testwell’s personnel to flag failing test results, and that the data entry staff and codefendant Caruso routinely tampered with lab data to falsify test results so that concrete that failed to meet the requisite threshold would appear to satisfy the engineer’s specifications. The testimony of one of Testwell’s data entry employees, stating that Barone filled in when Caruso was absent and that the employees reported to him “the same way,” was sufficient to establish Barone’s participation in Caruso’s scheme.
In addition, faxes from Barone’s Queens office with data alternations sent several times a week proved that Barone also altered the data. While Barone claims that those faxes never altered a failing result to a passing one, many of those changes either raised a result below the threshold to a number above it, or made alterations that brought the results much closer to a passing mark, although still technically failing. Thus, Barone’s alterations to the data left enough anomalies to make the data realistic, since the complete absence of any problematic results would have been highly suspicious to a professional engineer.
We reject all of defendants’ arguments relating to the fact that they were convicted of some counts and acquitted of others. There is nothing in any of the acquittals that would undermine the sufficiency or weight of the evidence supporting the convictions (see People v Rayam, 94 NY2d 557 [2000]).
The court properly exercised its discretion in excluding, as irrelevant, certain evidence offered by defendants (see Crane v *601 Kentucky, 476 US 683, 689-690 [1986]). The fact that concrete suppliers may have been aware that mix design reports had been generated without sufficient time having passed to do the requisite testing was not relevant with regard to the issue of whether the victims, i.e., the builders, architects, engineers, and regulators, had been defrauded by Testwell’s false reports.[1]
Similarly, the court properly excluded evidence that other materials testing laboratories used the same practice of providing estimated breaks in mix design reports. Evidence of an industry custom involving criminality cannot justify a criminal act (see Smith v United States, 188 F2d 969, 970 [9th Cir 1951]). The evidence is in any event irrelevant insofar as it tended to show that other testing companies cheated in the same manner as Testwell, but did not prove whether or not the victimized builders and regulators had been defrauded by the practice.
Defendants did not preserve their claims that the court’s interjections deprived them of a fair trial (see People v Charleston, 56 NY2d 886, 888 [1982]), and we decline to review them in the interest of justice. As an alternative holding, we find no basis for reversal. While the court made a few isolated remarks that were inappropriate, they were not unduly prejudicial, and the court instructed the jury to disregard what it had said.
The court properly directed Kancharla to pay reparations in the amount of $225,000 (see Penal Law § 60,27 [1]). Rancharla’s crimes at the mix design stage set in motion the chain of results that ultimately required the retesting, and it is not necessary that his conduct was not the sole cause, as long as his actions were a sufficiently direct cause of the ensuing harm (see People v DaCosta, 6 NY3d 181, 184 [2006]).
Part II
I believe that the evidence at trial more than sufficiently established the enterprise corruption counts as to defendants Kancharla and Barone. The evidence at trial showed a pervasive scheme involving systematic falsification of concrete data testing at many levels of the company, and defendants’ participation in the manipulation of the data. I would therefore affirm their convictions on those counts.
Defendant Kancharla was the owner and chief executive officer of Testwell Laboratories, Inc. Defendant Barone was Testwell’s vice-president of engineering. These defendants, several other employees and Testwell itself were charged with a series of crimes based on several separate criminal schemes *602 involving concrete and steel testing for major development projects, including the Freedom Tower, Yankee Stadium and the Jet Blue facilities at JFK Airport.
The “mix design” scheme involved Testwell’s mix design reports which purported to measure the respective strength of four proposed mixes of concrete at 7, 14 and 28 days applying compression strength tests. Instead, the mix design reports at issue were prepared using computer-generated numbers without any actual testing.
The “compressive/flexural strength alterations scheme” pertained to the requirement that the strength of the concrete actually used on a project be tested by a laboratory. Alfredo Caruso is a codefendant whose case was severed from that of these defendants. Caruso, the head of Testwell’s concrete department, allegedly instructed employees to flag low test results for his review, after which Caruso directed employees to insert a different number to alter the results. Barone was charged with participating in Caruso’s scheme.
The “steel inspections scheme” alleged that Testwell double-billed for the work of two Testwell steel inspectors who worked on projects for Tishman Construction and Silverstein Developers at the same time as the project for the Dormitory Authority of New York.
In my view, the evidence amply supported the enterprise corruption counts against defendants Barone and Rancharla. As relevant here, a person is guilty of enterprise corruption when he or she “is employed by or associated with a criminal enterprise and intentionally participates in the affairs of that enterprise by engaging in a pattern of criminal activity involving at least three criminal acts” (People v Besser, 96 NY2d 136, 142 [2001]; Penal Law § 460.20 [1], [2]). A “criminal enterprise” is defined as “a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents” (Penal Law § 460.10 [3]). Thus, “a criminal enterprise consists of three elements: (i) a common purpose, (ii) an ascertainable structure distinct from a pattern of criminal activity, and (iii) continuity of existence, structure, and criminal purpose” (see People v Pustilnik, 14 Misc 3d 1237[A], 2007 NY Slip Op 50407[U], *5 [Sup Ct, NY County 2007]). The first and third elements are easily satisfied in this case, since realizing an economic benefit was the common purpose, and there was extensive continuity.
With respect to the element of an ascertainable structure *603 distinct from a pattern of criminal activity, the criminal enterprise must be more than, and distinct from, “any ad hoc association entered into for the purpose of carrying out one or more of the criminal incidents relied upon to establish its existence” (People v Cantarella, 160 Misc 2d 8, 14 [1993]).
The majority on this point asserts that the People failed to introduce any evidence of a leadership structure or overall planning of the criminal enterprise. Yet, as the People argued at trial, the structure of defendants’ enterprise was largely based on the corporate structure of Testwell Laboratories, as is often true of defendants operating within the structure of a legitimate enterprise in order to conceal their crimes (see e.g. People v Pustilnik [enterprise assumed form of legitimate professional corporations used to perpetrate fraudulent insurance billing scheme]). The presence of a discernible organizational structure distinguishes this case from People v Western Express Intl., Inc. (85 AD3d 1 [1st Dept 2011]), in which I was in the dissent in finding insufficient proof of enterprise liability, and which was recently reversed by the Court of Appeals (19 NY3d 652 [2012]), on those grounds. In Western Express, involving the traffic of stolen credit card data via Internet sites, there were various individuals and organizations, each operating independently and with no overarching structure or system of authority. In this case, there is a discernible organizational structure, indeed a traditional hierarchical structure, in which persons at all levels of the corporation participated in the systematic falsification of concrete testing data.
The majority argues, in a related vein, that the scale of Testwell’s legitimate business refutes the proof of enterprise corruption, noting that only a small percentage of Testwell’s profits were ascribable to the alleged criminal activities. However, it is frequently the case that legitimate corporations may “both len[d] their corporate form, hierarchy and operations to criminal enterprises which flourish[ ] within their corporate structure” (People v Joseph Stevens & Co., Inc., 31 Misc 3d 1223[A], 2011 NY Slip Op 50808[U],*40 [2011]).
The Governor’s Memorandum approving the statute notes that relieving the People of the obligation to prove a distinction between the criminal enterprise and a legitimate one to which it may be connected “accomplishes two important results. First, it makes clear that groups that have both legitimate and illegitimate purposes, like a social club that ‘fronts’ for a criminal gang, or a pawn shop that is the center of a fencing operation, can constitute criminal enterprises. Second, it permits the hierarchy of and positions within a legitimate enterprise — for *604 example, a labor union, trade association or government agency — to contribute to the structure of a criminal group existing and operating within that legitimate enterprise.” (Governor’s Mem approving L 1986, ch 516, 1986 McKinney’s Session Laws of NY at 3177.)
Given that persons at all levels of the company participated in a series of continuing frauds and falsifications of data, and the manner in which one type of fraudulent activity was necessary to cover up another set of frauds, it would be reasonable to conclude that there existed a structured criminal enterprise “that enabled its members to repeatedly commit the pattern of criminal activity alleged in the indictment” (Pustilnik, 2007 NY Slip Op 50407[U], *7). Kancharla’s mix design scheme allowed the company to generate almost pure profit by charging $300 to $500 for a seemingly legitimate, but worthless, certification. Rather than testing the strength of the concrete at the required intervals, Testwell used computer algorithms to predict expected results, turning around reports in under a week.[2]
Barone hid flaws in the concrete and in Testwell’s field inspection process by altering lab results to conform to expectations. The evidence showed that Caruso and his team routinely altered results when they fell below the engineer’s requirements, ensuring that no one would question the authenticity of the reports.
Testwell’s computer system was programmed to erase the identity of any user making changes to test data, and further, to alert the user when results had already been reported to the client, a safeguard against the generation of contradictory reports.[3]
This is not a case where disparate crimes have been “stitched together” simply because the perpetrators all worked for the same company. It is evident from the pattern of criminal activ *605 ity that all of Testwell’s crimes were committed as part of a single enterprise, intent on increasing Testwell’s profits.
The fact that defendants were not personally charged in connection with every one of Testwell’s schemes or convicted of every count in which they were charged does not mean that they were in the dark about the criminal enterprise. There is no requirement that an enterprise member participate in, or be aware of, all of its crimes; provided the member is aware of the basic structure and purpose of the enterprise, and participates in the enterprise by committing the requisite number of criminal acts, he or she may be held criminally liable. Although, for example, Barone may not have been charged in the mix design scheme, the evidence showed that he knew about the scheme. Indeed, there would have been no reason for Barone to tamper with lab data to hide “low breaks” if the company had performed mix design testing as it should have. Similarly, although Rancharla may not have personally tampered with lab data, he relied on his staff to do so in order to cover up the mix design scheme.
Thumma, the director of laboratory testing, described the mix design scheme and the roles employees played in furtherance of the scheme.[4] Thumma reported to Rancharla, who was in charge of all technical operations and was responsible for the accreditation program. Thumma testified concerning the mix design software, which would generate results based on computer algorithms, rather than actual testing at the required intervals. These mix design reports were initially signed and certified by Rancharla himself, and later by Sterlacci and Thumma. At the time Thumma assumed this responsibility, he had a conversation with Rancharla concerning the mechanics of generating the reports. Rancharla assured him that the manner in which Testwell generated the mix design reports was standard practice in the industry and “there couldn’t be any problem using these reports and signing them.” Thumma testified that Rancharla also signed and stamped blank mix design reports.
Murthy provided equivalent evidence regarding the roles Barone, Caruso, Shah, Promushkin and others played in the test-alteration scheme. Murthy, who was responsible for inputting data from field reports, and matching the field data with results subsequently generated by the laboratory, testified that she was instructed once or twice a week to alter inputs so as to achieve a target number. She testified that she would “play around with” the compressive strength number so as to achieve *606 the result requested by Caruso, her direct supervisor. She testified that Caruso would “circle the number, and then give — put in a number, we would put in another number.” When Caruso was absent, Barone assumed his duties. In addition, Murthy’s office, which was responsible for data input, received faxes from Barone directing them to alter certain lab results. Murthy testified that when she input the requested data, the normal practice was to shred the faxes.
Forensic experts evaluating Testwell’s computer systems found evidence both of systematic alteration of test data and systematic efforts to cover up falsified results, including software that erased proof of the identity of the user who had altered any particular test result, and system warnings that would appear if staff attempted to change a result that had already been reported to the client. The evidence, in its totality, was more than sufficient to establish enterprise corruption (see e.g. Western Express, 85 AD3d at 9-10 [existence of Internet crime scheme established through evidence, inter alia, that site selling stolen credit card numbers helped its customers evade detection by law enforcement]). I would accordingly uphold defendants Rancharla and Barone’s convictions on the enterprise corruption counts.

 Although in my opinion a new trial should be held, lacking a majority of the Court for that position, I am constrained to agree in the modification of the sentences.

. Notably, where such documents were relevant with respect to a particular witness’s credibility or to show the victim’s knowledge, the court permitted the defense to introduce such exhibits.

. These reports were furnished to concrete suppliers, who in turn would deal with the project developers, the victims of the scheme to defraud. Thus, it cannot be assumed that the victims must have known about the falsification of results due to the quick turnaround of the reports.

. The People’s computer forensic experts testified at length concerning how management at Testwell had manipulated testing data. Comparing data from subsequent backups to the bar code for a given project, they were able to ascertain that load and stress data had been altered on a regular basis. Reviewing emails on the company’s hard drives, they found instructions to alter data such as “fix low breaks.” They also reviewed hard copies of faxes with requests for changes, such as Barone’s instructions on the Jet Blue project, and using the project bar codes found evidence that the data on those projects had been altered on the system. The People’s expert further found evidence of attempts to cover up what was going on, such as emails from Caruso “not [t]o request in writing to fix low breaks.” The People’s expert’s analysis found that data had been altered approximately 3,260 times on over 100 projects.

. Thumma also pleaded guilty to filing false mix design reports.