*221 OPINION OF THE COURT
Tom, J.E
Defendants ask this Court to alter the definition of “enterprise corruption” to include a criterion not contained in the statute — namely, that the “criminal enterprise” (Fenal Law § 460.10 [3]) must be so structured as to permit it to continue its existence without the involvement of one or more key participants. Because the statute expressly requires only “a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents” (id. [emphasis added]), not criminal “participants,” we reject this construction. Defendants’ remaining contentions are largely unpreserved and otherwise devoid of merit.
The evidence adduced against defendants Aron Goldman and Matthew Keschner supports the jury’s conclusion that they were knowing participants in a fraudulent scheme concocted by Gregory Vinarsky, and the verdict is not against the weight of the evidence. Vinarsky utilized health care clinics to fraudulently obtain money from insurance companies by submitting claims for unnecessary medical tests, procedures and medical devices or equipment on behalf of injured persons entitled to receive no-fault automobile insurance benefits. Vinarsky, who testified under a cooperation agreement, employed runners to find and solicit patients and hired medical personnel — including Goldman, an internist, and Keschner, a chiropractor — to supply medical services. Goldman and Keschner had both worked at a no-fault clinic set up by Vinarsky in 2001 in the Yorkville section of Manhattan. Since New York State regulations require that a medical clinic be owned by a physician, it was Goldman’s name that appeared on the relevant paperwork for the Yorkville clinic.
In 2002, Vinarsky closed the Yorkville operation and opened the St. Nicholas clinic, the facility involved in this prosecution, located on St. Nicholas Avenue in upper Manhattan. Goldman again signed as the owner of the corporate entity, St. Nicholas Avenue Medical Care, EC., while Vinarsky owned all of the businesses associated with the clinic’s operation, encompassing real estate, billing and administrative services. Keschner was hired as the clinic’s chiropractor and received, as remuneration, 35% of the profits he generated, with the remainder going to Vinarsky. Vinarsky instructed Keschner to direct patients to visit the clinic three times a week for chiropractic treatments and offered Keschner $5 to $10 for each water circulating unit he *222 prescribed (for which Vinarsky received a $50 kickback from the unit’s distributor). As to Goldman, Vinarsky stated that since the doctor had worked at the Yorkville clinic, there was no need to explain what was expected of him.
Vinarsky devised a five-page, printed “initial evaluation” form, which listed a series of tests and treatments the doctors were expected to order and included prepared diagnostic impressions. The form concluded with sections dealing with the treatment plan and consultation referrals, including one advising that the patient receive physical therapy at least three times a week, the maximum frequency of treatments reimbursed by insurance companies. Included was a list of durable medical equipment that could be ordered and a preprinted section providing that the patient’s prognosis was “guarded.” Many of the prescribed medical tests were performed at the St. Nicholas clinic, and Vinarsky received kickbacks for tests administered at outside facilities.
The jury heard testimony from patients who were given tests and prescribed treatment despite never having complained of pain in the particular area of the body corresponding to the diagnosis. The jury also heard from investigators for various insurance carriers, who testified concerning the receipt of claims forms and medical reports. In the case of one patient, bills were submitted for injuries he had allegedly sustained in connection with three successive automobile accidents, without mention of any preceding accident or an even earlier motorcycle accident. Testimony was also heard from undercover officers and a confidential informant, who presented themselves at the clinic for evaluation, and from a forensic accountant and a statistician, who analyzed the clinic’s treatment and financial records.
Defendants were tried jointly and convicted of enterprise corruption and related offenses, including grand larceny, scheme to defraud, money laundering and insurance fraud. Goldman was sentenced to a term of 2[1]/2 to l[1]!2 years and an $800,000 fine, and Keschner to a term of IV2 to years and a $750,000 fine. Defendants remain free on bail pending appeal.
Both defendants contend that their convictions of enterprise corruption are unsupported by legally sufficient evidence and are against the weight of the evidence. In particular, they argue that because Vinarsky was essential to the operation of the St. Nicholas facility, it lacked the structure to maintain the necessary continuity of existence in his absence. Thus, they conclude, the clinic did not meet the statutory requirements of a criminal *223 enterprise essential to sustain convictions for their participation in its operation.
While Keschner moved to dismiss the enterprise corruption count on this basis, Goldman did not, thereby failing to preserve the issue for appellate review (see People v Vargas, 236 AD2d 258 [1st Dept 1997], lv denied 90 NY2d 865 [1997] [objection by one codefendant does not preserve an issue for the other]). In any event, the argument is without merit. Defendants rely on People v Yarmy (171 Misc 2d 13 [Sup Ct, NY County 1996]), in which the court correctly found that the People had not established the existence of a criminal enterprise to support the defendant’s conviction of enterprise corruption.[1] The court reasoned that the arrangement between Yarmy, the licensed firearms dealer who supplied weapons, and his accomplice, who acted as a distributor by selling them to local gang members, did not constitute “a structured organization” but merely two persons acting in concert (with the occasional assistance of a family member) to advance their respective interests (id. at 18-19). Absent was “any semblance of a hierarchical organization beyond what is minimally necessary to effectuate the individual sales” (id. at 17). The court noted that the asserted criminal enterprise, Yarmy Sporting Company, had no independent capacity to purchase arms since the license was personal to the defendant, noting this as “further evidence that there was no separate enterprise” (id. at 20).
*224 In addition to finding the absence of any criminal enterprise, the court proceeded to address its continuity, examining the association between Yarmy and his accomplice. The court cited cases finding a sufficient structure where “the enterprise continues with the same purpose and any new members joining the enterprise fill roles previously performed by former members” (id,.). The court then opined, in dictum, that “one important factor in determining continuity is whether the organization could exist after the removal — by arrest or otherwise — of any of the participating member(s)” (id.). The court concluded that the organization consisting of Yarmy and his accomplice “could not continue to exist as a criminal enterprise independently of the defendant” (id. at 20-21).
The cases cited by the court, however, state only that an organization’s identity as a criminal enterprise is not defeated simply because there is some exchange of personnel. The cited authority does not support the inverse proposition that interchangeability of personnel is essential to statutory recognition of an organization as a criminal enterprise. To the contrary, the Court of Appeals has stated that the statutory requirement of “continuity of existence, structure and criminal purpose” (Penal Law § 460.10 [3]) is met when an organization exhibits “constancy and capacity exceeding the individual crimes committed under the association’s auspices or for its purposes” (People v Western Express Intl., Inc., 19 NY3d 652, 658 [2012]). Defendants argue, nevertheless, that Yarmy has been endorsed by the Second Department. Indeed, in discussing its memorandum decision in People v Nappo (261 AD2d 558, 559 [2d Dept 1999], revd on other grounds 94 NY2d 564 [2000]), that court stated that “the People failed to establish either an ‘existing organized crime entity’ or any continuity of existence wherein the said entity was capable of continuing without the participation of William S. Nappo and William K. Nappo” (People v Conigliaro, 290 AD2d 87, 89 [2d Dept 2002], lv denied 98 NY2d 650 [2002]). The Nappo decision, however, like Western Express, holds only that the evidence before the grand jury was “insufficient to establish that the respondents engaged in any structure, business, activity, or continuity of criminal purpose beyond the scope of the criminal incidents alleged in the indictment” (261 AD2d at 559 [emphasis added]). To the extent that Conigliaro may be read as holding that the involvement of one or more irreplaceable participants removes an organization from the statutory definition of “criminal enterprise,” we decline to follow it.
*225 The evidence before the jury amply demonstrates that defendants were engaged in a criminal enterprise overseen by Vinarsky. It embraced more than one clinic, extended over a period of years, and involved a succession of patients whose medical history was used to procure income by an organization structured to facilitate the fraudulent billing of insurers, which paid some $6 million for services allegedly provided by the St. Nicholas clinic. Thus, the jury was warranted in concluding that the criminal enterprise had a continuity that extended beyond any individual patient or transaction.
Defendants raise a variety of claims that are unpreserved by objection at trial, and this Court declines to reach them in the interest of justice. In any event, we perceive no merit to the arguments they now put forward.
Goldman asserts that his conviction for grand larceny by false pretenses — by misrepresenting himself on insurance forms as the “owner” of the clinic — must be overturned because the corporate filing lists him as the registered owner. This argument was never presented to the trial court. Furthermore, defendants misrepresented themselves as providing treatment actually administered by others and by ordering procedures merely purporting to offer some therapeutic benefit to the patient, representations which likewise constitute false pretenses sufficient to sustain conviction for larceny.
Goldman also complains that the statistical analysis presented by Dr. Shing Lee, the People’s biostatistician expert witness, while showing a higher incidence of treatment by Goldman than his colleagues, failed to identify the reason for the difference as a deviation from the appropriate standard of care. Although Goldman moved to preclude Dr. Lee’s testimony altogether, he never made the argument now advanced; nor did he object to the use made by the prosecutor of Dr. Lee’s evidence on opening and summation. Moreover, this evidence is relevant to testimony given by Vinarsky and tends to demonstrate an intent to maximize profit from the enterprise by ordering as many procedures as possible. Thus, it was admissible (see People v Yazum, 13 NY2d 302 [1963]).
Similarly, with respect to Vinarsky’s testimony concerning the Yorkville clinic, Goldman interposed only a general claim of prejudice (People v Molineux, 168 NY 264 [1901]; see People v Resek, 3 NY3d 385, 389 [2004]). He did not complain, as he now does, that it was irrelevant and prejudicial because Vinarsky failed to testify concerning conversations demonstrating Gold *226 man’s knowledge that the Yorkville clinic was operated illegally, as described by the prosecutor in his offer of proof. Be that as it may, both defendants asserted their ignorance of wrongdoing at the Yorkville facility and its fraudulent billing practices, and Vinarsky’s testimony was relevant to that issue. Furthermore, had a timely objection been interposed, the court could have considered appropriate corrective action, including whether to strike objectionable testimony.
Goldman contends, generally, that the proof against him is insufficient to demonstrate either his intent to commit any crime or his knowledge of criminal wrongdoing at the St. Nicholas clinic, denigrating the probative value of the evidence adduced by the prosecutor. While Goldman is correct that certain evidentiary items, taken in isolation, are insufficient to establish guilt — particularly, his mere presence at the clinic (see People v Cabey, 85 NY2d 417, 421 [1995]) and his denial, under oath, that he knew Keschner was working as a chiropractor at the Yorkville clinic (see People v Bierenbaum, 301 AD2d 119, 139 [1st Dept 2002], lv denied 99 NY2d 626 [2003], cert denied 540 US 821 [2003]) — the jury was entitled to draw reasonable inferences based on the totality of the proof to infer intent “from the defendant’s conduct and the surrounding circumstances” (People v Bracey, 41 NY2d 296, 301 [1977] [internal quotation marks omitted]). Indeed, the evidence showing that Goldman overprescribed tests and treatment, allowed Vinarsky to use his professional license to obtain regulatory approval, abdicated control over the St. Nicholas clinic’s operation, and was previously employed at the Yorkville clinic run by Vinarsky, warrants the reasonable inference that he knowingly and willingly participated in the fraudulent scheme.
Both defendants take issue with the court’s supplemental instructions on accessorial liability.[2] However, this Court finds that “the charge, in its entirety, conveys an appropriate legal standard and does not engender any possible confusion” (People v Wise, 204 AD2d 133, 135 [1994], lv denied 83 NY2d 973 [1994]). The trial court initially informed the jury that the burden of proof never shifts to the defendant and that each defendant can be held responsible for the acts of another person only if the evidence proves that the “defendant had knowledge *227 of the crime and intentionally aided or assisted the other defendant, or others who are not on trial at this time, in committing the crime, or if the defendant under consideration requested or directed that the crime be committed.” The court then quoted the pertinent pattern jury instruction in its entirety.
Defendants take issue with the court’s response to a jury note asking (1) whether grand larceny must encompass the entire St. Nicholas clinic or merely one doctor’s individual practice; and (2) for an explanation of “accomplice culpability.” After the court delivered supplemental instructions, counsel objected that the court had not mentioned that the pertinent crime was grand larceny nor that defendants “must have the mental culpability of grand larceny in order to have accessorial liability.” It is clear from the first question, however, that the jury was well aware of the nature of the underlying offense, and the court responded that, to be guilty as an accessory, a defendant must have “had knowledge of a crime, intended that it be committed and did something to intentionally direct or assist in its commission.” The court’s emphasis on intent sufficiently conveyed the need to find the requisite culpability (Penal Law §§ 15.00 [6]; 15.05 [1]). Moreover, a remark that is merely amenable to interpretation as shifting the burden of proof, when made in the context of explicit instructions properly imposing the burden on the People, does not obviate the need to raise a specific objection to preserve the issue for review (People v Thomas, 50 NY2d 467, 472 [1980]).
On appeal, defendants assign error to the court’s use of the conjunctive in stating, with respect to accessorial liability, that a defendant
“is either guilty because he had knowledge of a crime, intended that it be committed and did something to intentionally direct or assist in its commission. Or, he is not guilty, because he had no knowledge of the crime, had no intent to commit it and did not intentionally engage in any conduct or act to direct or assist in it.”
Defendants urge that the court’s use of the word “and” in the second sentence confused the jury by implying that it could not acquit either a defendant with no knowledge of a crime who unknowingly committed an intentional act that advanced it or a person with mere knowledge of a crime who took no steps to assist in its commission. Again, the court’s instructions, when viewed in their entirety, conveyed the appropriate legal standard (Wise, 204 AD2d at 135).
*228 Upon review of a criminal conviction, it is the function of an appellate court to examine errors brought to the attention of the trial justice at a time when remedial action is still possible (People v Gray, 86 NY2d 10, 20-21 [1995]). Reversal is not available for error identified only after belated, albeit meticulous, examination of the trial transcript in preparation for appeal (CPL 470.05 [2]). It has been observed that “parties to litigation, even parties to a criminal prosecution, may adopt their own rules at trial by the simple expedient of failing to object to evidence offered or to except to instructions given [to] the jury” (People v Lawrence, 64 NY2d 200, 206 [1984]). This principle applies even where, as here, the asserted error implicates the sufficiency of the evidence supporting conviction (Gray, 86 NY2d at 21).
Both defendants now complain that the People’s opening remarks were prejudicial. The prosecutor informed the jury that only a “representative sample” of the many patients treated at the St. Nicholas clinic would testify and provided reasons why more witnesses would not be called. Goldman now claims that these comments improperly suggested that the uncalled witnesses, if required to take the witness stand, would have invoked the Fifth Amendment privilege against self-incrimination. Keschner additionally asserts that the remarks transgressed the unsworn witness rule.
Neither argument was raised at trial and both lack merit. The prosecutor’s explanation as to why, of the thousands of patients treated at the clinic, only a few would testify does not offend the unsworn witness rule since a prosecutor is obliged to deliver an opening statement that addresses the charges against the accused, what the facts are anticipated to demonstrate and, as pertinent here, the supporting evidence that is to be introduced (see People v Kurtz, 51 NY2d 380, 384 [1980], cert denied 451 US 911 [1981]). Nor are the prosecutor’s comments subject to attack for intimating that uncalled witnesses would have invoked the Fifth Amendment privilege against self-incrimination, since no witness was ever called to the stand for that purpose (see People v Berg, 59 NY2d 294, 298-299 [1983]). The People were entitled to explain why only three clinic patients would be testifying, both to address potential jury concerns and to obviate a missing witness charge (see generally People v Macana, 84 NY2d 173 [1994]).
 There is no merit to Keschner’s unpreserved assertion that the court’s charge on fourth degree insurance fraud *229 limited the offense to a claim submitted to an insurer based on an actual, as opposed to a purported, “policy” of insurance (that is, claims submitted on behalf of an undercover officer or insurance investigator as opposed to an actual patient). Notably, the statutory definition of “insurance policy” includes a “purported” policy (Penal Law § 176.00 [1]). Nor is there merit to Keschner’s similarly unpreserved assertion that the evidence is insufficient to sustain his conviction for money laundering because the “monetary instrument” (Penal Law § 470.00 [1]) involved in the underlying “financial transaction” (Penal Law § 470.00 [7])[3] was neither a personal check nor a bank check but a check drawn on a business account. Keschner fails to explain why a business check does not qualify as a “personal” (as opposed to a “bank”) check, nor why the use of a business check should not be regarded as entailing either “the movement of funds by wire or other means” or “the use of a financial institution” (Penal Law § 470.00 [7] [a], [d]) so as to come within the ambit of the statute.
With regard to summation, neither defendant raised the objection both now assert — that the prosecutor’s comment concerning their failure to rebut Dr. Lee’s statistical analysis shifted the burden of proof to the defense. Despite the omission, the court immediately reminded the jury that “the burden is always on the prosecutor to show that the elements of the crime have been proven,” and neither defendant complained that this curative instruction was inadequate. Thus, the claim is unpreserved (People v Gonzalez, 39 AD3d 434, 434 [1st Dept 2007], lv denied 9 NY3d 876 [2007]). In any event, the prosecutor’s remarks were responsive to Goldman’s attack on Dr. Lee’s analysis as “worthless” and consisting of “lies” (see People v Halm, 81 NY2d 819, 821 [1993]). The People were entitled, in rebuttal, to point out the lack of substance to the attack, observing that Goldman had not proposed any alternative conclusion than the one proposed by Lee — namely, that Goldman had ordered far more tests than his colleagues at the clinic. Merely pointing out the lack of evidentiary support for a claim made by a defendant does not shift the burden of proof (see People v Gurley, 28 AD3d 347, 348 [1st Dept 2006], lv denied 7 NY3d 813 [2006]). Goldman concedes that the numerous prosecutorial comments about *230 which he now complains are virtually all unpreserved. Moreover, they fall within the wide latitude afforded a prosecutor in commenting upon the evidence and in drawing fair inferences therefrom (People v Galloway, 54 NY2d 396 [1981]).
Defendants’ other contentions have been examined and found to be without merit.
Accordingly, the judgments of the Supreme Court, New York County (Rena K. Uviller, J.), rendered March 15, 2011 and April 8, 2011, following a joint jury trial, convicting defendant Keschner of enterprise corruption, scheme to defraud in the first degree, two counts of grand larceny in the first degree, money laundering in the second degree, four counts of insurance fraud in the fourth degree, and two counts of falsifying business records in the first degree, and convicting defendant Goldman of enterprise corruption, scheme to defraud in the first degree, two counts of grand larceny in the first degree, money laundering in the first and second degrees, five counts of insurance fraud in the third degree, three counts of insurance fraud in the fourth degree, and one count of falsifying business records in the first degree, and sentencing Keschner to an aggregate term of IV2 to 41/2 years and a $750,000 fine, and Goldman to an aggregate term of 2V2 to 7x/2 years and an $800,000 fine, should be affirmed, and the matter remitted to Supreme Court, New York County for further proceedings pursuant to GPL 460.50 (5).
Andrias, Saxe and Gische, JJ., concur.
Judgments, Supreme Court, New York County, rendered March 15, 2011 and April 8, 2011, affirmed.

. Penal Law § 460.20 (1) provides as follows:
“A person is guilty of enterprise corruption when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he:
“(a) intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity; or “(b) intentionally acquires or maintains any interest in or control of an enterprise by participating in a pattern of criminal activity; or
“(c) participates in a pattern of criminal activity and knowingly invests any proceeds derived from that conduct, or any proceeds derived from the investment or use of those proceeds, in an enterprise.”
Penal Law § 460.10 (3) defines “criminal enterprise” as “a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents.”

. Pursuant to Penal Law § 20.00, a person is criminally liable for the conduct of another person “when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.”

. Penal Law § 470.00 (7) defines “financial transaction” as one involving “(a) the movement of funds by wire or other means”; “(b) one or more monetary instruments”; “(c) the transfer of title to any real property, vehicle, vessel or aircraft”; or “(d) the use of a financial institution.”